## NOVEMBER SESSION 1871, IN BOSTON.

### [CONTINUED FROM VOL. CVIII.]

PRESENT:

Hon. REUBEN A. CHAPMAN, Chief Justice.
Hon. HORACE GRAY, Jr.,
Hon. JOHN WELLS,
Hon. JAMES D. COLT,   ' } Justices.
Hon. SETH AMES,
Hon. MARCUS MORTON,

## SUFFOLK COUNTY.

### Edward D. Sohier & others vs. Trinity Church & others.

The words "in trust nevertheless and upon condition always" to use the premises for public worship, in a deed of land to a religious society, do not necessarily create a condition, but may import merely a trust.

Pewholders in a church building have only a qualified and usufructuary right in their pews, subject to the right of the religious society to remodel them, and to alter the internal structure of the building, or enlarge or remove it, or sell it in order to build anew.

Whenever church property is held in trust for the general purposes of the religious society, and cannot otherwise be conveyed, the legislature has constitutional power to authorize the trustees to convert their real estate into personal, in order that the avails may be reinvested or otherwise appropriated to the purposes of the trust.

Owners of tombs in the church building of a religious society have no title in the land, but only an interest in the structures and in their proper use, and cannot prevent a sale of the land and building by the society, nor the removal of the remains from the tombs, when such removal is in other respects conducted according to law; as for instance when the legislature has directed it in the exercise of its powers in relation to the public health;

and the tomb of one who devised real estate to the society in trust "for keeping said tomb in good and decent repair" is held by the same usufructuary right, and subject to the same liability to removal.

A recital in a special act of the legislature, that the continuance of a cemetery in the church building of a religious society is injurious to the public health, cannot be contradicted by any statement of the officers of the society, previously made, asserting a contrary opinion.

A canon of the Protestant Episcopal Church, requiring the consent of the bishop and standing committee to removing or otherwise disposing of the church building of any parish in the diocese, does not affect the legal right of a parish to dispose of its church building under authority of a statute of this Commonwealth without such consent first obtained.

BILL IN EQUITY, filed May 11, 1871, by the owners of eight pews, and the so called "representatives" of four tombs, in the church building of Trinity Church in the city of Boston, a religious society incorporated by the St. of 1830, c. 83, against the corporation and its senior warden and its clerk, to compel disclosures by the two latter in response to allegations concerning doings of the corporation and its predecessors, and to restrain the corporation from exercising powers given by the St. of 1871, c. 221, particularly from selling a parcel of land on the east side of Summer Street in Boston, on which the church building was standing, from interfering with rights of the pew owners, from removing bodies interred in tombs under the building, and from interfering with further use of the tombs for interments. By the bill and answers, and a report of the case by *Colt*, J., who reserved it for the determination of the full court, these facts appeared:

On April 30, 1730, Leonard Vassall, then owning in fee simple the greater part of the parcel of land, "for and in consideration of the sum of five hundred fourteen pounds, seven shillings and two pence, in good public bills of credit of the Province," conveyed all his said estate to "John Barns, merchant, John Gibbins, apothecary, and William Speakman, baker, all of Boston," their heirs and assigns forever, "to and for the special use, trust and confidence hereafter mentioned, and to and for no other use, intent or purpose whatsoever, that is to say, that they, the said John Barns, John Gibbins and William Speakman, any or either of them, their, any or either of their heirs or assigns, shall and will with all convenient speed endeavor to procure a building to be

erected on the said land for the worship of God; which building or church they, any or either of them, their, any or either of their heirs or assigns, shall take care to be contrived and disposed both without and within as they, any or either of them, their, any or either of their heirs or assigns, (in the absence of the other,) shall find and judge most conducing to the decent and regular performance of divine service, according to the rubrics of the common prayer book used by the Church of England, as by law established, and the same be appropriated for the said pious and most Christian use, intent, and purpose forever; but in case of not erecting the said church or building as aforesaid upon the said premises, or in failure of appropriating the same to the said pious and most Christian use, according to the true intent of these presents, as aforesaid, within five years and five months from the eleventh day of April current, then to the use of the said Leonard Vassall and his heirs forever, he or they repaying the sum of four hundred and fifty pounds, and no more."

On February 28, 1735, by an indenture of that date, between Gibbins and Speakman (in the absence of Barns) of the first part, and "Peter Luce, merchant, Thomas Child, distiller, William Price, cabinet maker, and Thomas Green, merchant, all of Boston, being a committee duly chosen by sundry persons who advanced divers sum of money towards erecting and building a new church in Summer Street in Boston," of the second part; reciting the terms of the trust in the former deed, and that " whereas the said church hath since been erected and built pursuant to the said use, trust and intent and purpose, and, in the building and erecting the same, sundry large sums of money have already been advanced and paid by divers piously disposed persons, to be reimbursed out of the moneys that shall arise upon the alienation of the pews or seats of said church, and whereas to complete and finish the said church further considerable sums of money must likewise be laid out and expended by the said Luce, Child, Price and Green;" the party of the first part conveyed the premises to the party of the second part, " to and for the special use, trust and confidence hereafter mentioned, and to and for no other use, intent or purpose whatsoever, that is to say

to and for the use of the said " party of the second part, their heirs and assigns, until such time as they " shall, by the sale and alienation of the pews and seats of the said church, or otherwise howsoever, be fully reimbursed all and every such sum and sums of money already advanced by sundry well disposed persons towards the erecting and building of said church as aforesaid, as also all such other sum or sums of money hereafter to be laid out. paid and expended by " them or either of them " towards the completing and finishing of the said church," or until they, their heirs, executors, administrators and assigns, and every of them, " shall have the payment of all such sum and sums of money so advanced, paid, laid out and expended as aforesaid, secured to their satisfaction by the church wardens and vestry of the said church, hereafter to be duly chosen, and likewise be indemnified and saved harmless from all contracts, obligations, agreements and articles by them made, done and executed, or hereafter by them to be made, done and executed towards the erecting, building, finishing and completing the said church as aforesaid, and of and from all costs, charges and damages that they, their heirs, executors, administrators and assigns, may suffer, sustain or be put to, for or by means thereof ; and from and immediately after the payment of all and every the aforesaid sum and sums of money in manner as aforesaid, or security so given as aforesaid, then to and for the use of the church wardens and vestry of the said church and their successors forever." And the party of the second part covenanted and agreed, " from and immediately after the payment of all and every the aforesaid sum and sums of money in manner as aforesaid, or such security so given as aforesaid," to execute " one or more deeds in the law, as by counsel shall be devised for the better passing and conveying the said church, land and premises, with the appurtenances, unto the church wardens and vestry of said church, and their successors forever, free from all gifts, grants, mortgages, dowers and incumbrances whatsoever, by them had, made, done or committed, or by any person or persons claiming by, from or under them."

On October 10, 1739, by an indenture between the grantees in the indenture of February 28, 1735, of the first part, and " Wil-

liam Speakman, baker, and Joseph Dowse, merchant, the present church wardens of the said church, now called Trinity Church, and John Arburthnot, distiller, Philip Dumaresque, merchant, Charles Apthorp, merchant, Benjamin Faneuil, merchant, John Merrett, merchant, John Hancock, wine cooper, Thomas Austin, apothecary, Henry Laughton, tailor, Peter Kerwood, merchant, Rufus Green, goldsmith, Lawrence Lutwyche, distiller, James Griffin, merchant, and William Coffin, merchant, all of Boston, the present vestry of the said church," of the second part; reciting the previous conveyances, and the provisions thereof; the party of the first part, for and in consideration that they, " by the sale and alienation of sundry pews and seats in the said church, already disposed of to divers persons," were " fully reimbursed and paid all such sum and sums of money as hitherto have been advanced by sundry well disposed persons towards the building of the said church," and were also indemnified and saved harmless from all contracts, obligations, &c., towards completing it, and for the further consideration of twenty shillings, lawful money of New England, to them in hand paid by the party of the second part, gave, granted, bargained and sold unto the said party of the second part, and their successors in office, " as well the aforementioned piece or parcel of land, as also the said edifice or building thereon standing, now used for the public worship of God, called Trinity Church," to have and to hold unto the said party of the second part, and their successors in office, " in trust nevertheless, and upon condition always, that the said edifice or building called Trinity Church, and the land aforesaid whereon it stands, and before conveyed, shall from henceforth and forever hereafter be converted, improved, appropriated and made use of for the public worship of God according to the rubric of the common prayer book used by the Church of England, as the same is settled and established by an act of the parliament of England, made in the first year of the reign of Queen Elizabeth, entitled ' an act for uniformity of common prayer and service in the church, and administration of the sacraments,' and another act of the parliament of England, made in the thirteenth year of the reign of King Charles the Second, entitled ' an act for the ani-

formity of public prayers and administration of sacraments and other rites and ceremonies, and for establishing the form of making, ordaining and consecrating bishops, priests and deacons in the Church of England,' and be converted, improved and used to and for no other use or purpose whatsoever ; and also that the right of presentation of a minister or ministers for the said church shall be continued and remain from henceforth successively forever hereafter in the proprietors of the several pews in the said church, or the major part of them that shall be present and convened together on a legal warning or notification given by order of the church warden or wardens for the time being for that purpose ; always provided, that only one vote and no more shall at all times be allowed to each pew in the said church, agreeable to a vote of the said church, passed and entered in the said church books for that purpose, the fifth day of March, Anno Domini one thousand, seven hundred and thirty-five, and in no other person or persons whatsoever, any right that thereunto may otherwise be claimed notwithstanding, and that all votes for the choice of a minister or ministers, and all officers and their salaries, shall be by written votes and no otherwise."

The religious society to which the premises were thus conveyed worshipped in the building so erected and conveyed, until 1828–9, when they demolished it and erected the present church building on the same parcel of land, wherein they have continued to worship to this time. The building committee for the erection of the present building was appointed on February 8, 1828 ; and the last service held in the former building was on August 3 of that year.

On September 10, 1736, the society voted that, " whereas the committee of Trinity Church has been at a great trouble in seeing the building so far carried on, and have likewise spent a great deal of time and always their own money in their meetings, and more especially for that they have been bound for large sums of money for carrying on the work, it is thought reasonable that they should have the liberty each of them to build a tomb of a common size under said church at their own cost and charge, without paying anything for the ground to said church ; that

likewise Leonard Vassall and William Speakman have the same liberty with the committee ; that any proprietors may have liberty to build a tomb of the common size under the church in such place as the present committee or wardens, when chose, shall appoint, for the burying in his relations, he or they paying ten pounds for the use of said church, but that no man or person shall have liberty to put in any corpse not related to them without five pounds to the use of the church for each corpse so buried." Several of the proprietors availed themselves of this liberty, and built tombs accordingly, but the records of the society omit to show who were the original proprietors of any tombs built under the former church building, and no deeds thereof were given by the society.

On May 11, 1828, the society voted that the building committee appointed February 8, 1828, " be authorized to make any and all agreements with the proprietors of the tombs under the church, for the removal or the rebuilding of the same, which said committee may think proper ; " and the committee were authorized, if it should be found " expedient or necessary to deprive any such proprietor of the tomb he now owns," to make him such compensation therefor in money, or by giving him a new tomb, as might be agreed by them with him. In constructing the present church building, fifty-five tombs were built under it, " outside of the old tombs ; " and on September 13, 1829, the society voted " that the wardens be directed to give deeds to the original proprietors of tombs who shall appear to be the legal owners, in conformity to the deeds reported by the committee." Thereupon deeds of nineteen new tombs were given by the wardens in the form printed in the margin ; * and four new tombs were assigned

---

* " Whereas in the erection of a new church edifice, by the Proprietors of Trinity Church in the city of Boston, it became necessary to alter and rebuild the cemetery under the former building, and in so doing the tombs of many individuals were necessarily demolished, and in some instances a change of situation became unavoidable ; and whereas          alleges that a certain tomb in said former cemetery, having the name of          over it, belonged to          , which said tomb was removed or altered. And it has been agreed that the owner of said tomb shall receive and hold tomb num-

respectively, without deeds, to the names of Thomas Child, Charles Harrison, John McLennan and William Price, those four names, and the names of the grantees of the nineteen, being the "names of the owners of tombs under the old church edifice at the time the present church was erected, so far as known;" and out of the rest of the fifty-five new tombs, thirty-three were sold at different dates, the first on October 7, 1829, and the last on February 12, 1851, for pecuniary considerations varying from $450 to $136, and conveyed to the respective purchasers by deeds in the form also printed in the margin.*    Many of the former

bered    , situate in the     side of     aisle of the cemetery under the new church, in lieu of, or in satisfaction for the said tomb removed or altered as aforesaid; Now these presents witness, that the Proprietors of Trinity Church, acting herein by the wardens of said church, who are duly authorized in their behalf, in consideration of the premises, hereby bargain, sell and confirm unto the said    , representatives and assigns, the aforesaid tomb numbered     in the present cemetery of Trinity Church, with all the privileges thereto belonging, to have and to hold said tomb, numbered    , unto the said    , representatives and assigns, to     own use forever, in case the said     was the lawful owner and proprietor of said tomb in the former cemetery, otherwise to and for the use of such person or persons, as was, or were, the lawful owners of said tomb last mentioned, his, her, or their representatives and assigns forever.

} Wardens.

"Boston,    . Received of the wardens of Trinity Church a deed of tomb No.    , of the tenor and effect of the above copy, and declare that     will hold the same tomb in conformity therewith."

* "Be it known, that the Proprietors of Trinity Church in the city of Boston, by the wardens of said church, who are duly authorized in their behalf, hereby acknowledge the receipt of     dollars from    , and, in consideration thereof, bargain, sell and convey unto the said    , representatives and assigns, the tomb under Trinity Church in Boston aforesaid, which is numbered    , and situate on the     side of the     aisle in the cemetery; with all such privileges, and subject to such restrictions and regulations, as are incident to the nature, use and situation of this property; to have and to hold said tomb, numbered    , unto the said    , representatives and assigns, to his and their use forever: Provided however, that no assignment or conveyance of said tomb shall be effectual to pass the same to the vendee or grantee until the sale or transfer has been declared to the

owners of tombs are dead, leaving no claimants of their respective tombs who are known to the society.

William Price, above mentioned, to whose name one of the new tombs was assigned, was the original proprietor of one of the old tombs, and by his will devised certain real estate in trust, among other things, " for keeping my tomb which is under Trinity Church in good and decent repair." By an indenture dated November 21, 1828, between the rector and wardens of Trinity Church, of the first part, the vestry and pew owners of the church, of the second part, the rector or minister and wardens of King's Chapel in Boston, of the third part, and the vestry of said° King's Chapel, of the fourth part, the said parties of the first and second parts became bound to execute the trust, and the title to the trust estate has been confirmed by a decree of this court. His original tomb was removed, before the execution of this indenture, in the course of demolition of the original church building and construction of the present building. The new tomb, assigned to his name by the building committee in its stead, bears a tablet inscribed " William Price, 1736," and is inspected annually by the wardens of the church.

It was admitted, for the purposes of this report, " that the Reverend Samuel Parker, the rector of Trinity Church, was authorized on July 18, 1776, by the wardens and vestry, and afterwards by the proprietors of the church, to omit that part of the liturgy which related to the king; that said Parker was on September 5, 1787, authorized to attend a general convention of the Episcopal Church in Philadelphia ; that at an Episcopal conven-

---

wardens of said Church for the time being, and a record thereof made on the church records.

" In witness whereof, the wardens have subscribed this instrument this day of        in the year of our Lord one thousand eight hundred and

" Executed and delivered in presence of

$\left.\begin{array}{c} \\ \\ \end{array}\right\}$ Wardens.

" Boston,         .   Received of the wardens of Trinity Church a deed of tomb No.     , of the tenor and effect of the above copy, and declare that            will hold the same tomb in conformity therewith."

tion held in Philadelphia on September 29, 1785, certain changes were made in the prayer book, and that the prayer book as then established has ever since been used ; that in the preliminary transactions with the archbishops and bishops of the Church of England, which secured the transmission of the episcopate from the Church of England to the American Church, assurance was given in the form of a letter from the general convention of the American Church to the English prelates, that the former had not departed and did not purpose to depart from the doctrines of the Church of England ; that at a meeting of the Episcopal cler-. gymen in Boston, on September 8, 1784, a resolve was passed, that the doctrines of the Gospel be maintained as then professed by the Church of England, and that uniformity of worship be continued as near as may be to the liturgy of said Church ; and that at the triennial convention held in 1814 a declaration was made ' that what is now called the Episcopal Church in the United States of America is precisely, in succession, the body formerly known by the name of the Church of England in America.' "

On May 5, 1823, the proprietors of Trinity Church voted to apply to the legislature for an act of incorporation ; and on April 4, 1831, they accepted the act passed by the legislature on March 12, 1831, the material parts of which are printed in the margin.*

---

* The St. of 1830, *c.* 83, passed on March 12, 1831, enacted, in § 1, " that the proprietors of pews in Trinity Church in the city of Boston, together with all persons who shall hereafter become owners of pews in said church, be, and they are hereby incorporated and made a body politic and corporate, by the name of Trinity Church, in the city of Boston, and may have, exercise and enjoy all the rights and privileges which as a Protestant Episcopal Church they have heretofore possessed and enjoyed, and to which other religious societies are by law entitled."

SECTION 2 provided " that the said corporation shall be deemed and taken to be the successors of said society, and all real and personal estate heretofore held by said society is hereby confirmed to said corporation, to be held and used by them in the manner and for the purposes in and for which the same has heretofore been held and used ; and all contracts, engagements and obligations heretofore made, entered into, and incurred by said religious society,

At the annual meeting of the corporation on April 28, 1851, the record of the previous annual meeting was amended by adding " the verbal report of the wardens that they had visited the cemetery during the year and it was in good order." On January 1, 1853, the cemetery was closed by an order of the mayor and aldermen of the city of Boston acting as a board of health. At the annual meeting of the corporation on March 28, 1853, it was voted " that the committee on the cemetery be authorized to remonstrate with the city authorities in relation to their late action in reference to the cemetery under the church, with authority to employ counsel to secure the rights of the proprietors of the tombs under the church." On May 9, 1855, the wardens, in behalf of the proprietors of the cemetery, petitioned the board of health to rescind the order of January 1, 1853, for closing it; and alleged in the petition " that said cemetery under Trinity Church was not then and is not now likely to be the cause of any nuisance or injury to the health of any citizens of Boston." At the hearing on the petition the church was represented by the wardens and by counsel, and medical testimony was introduced by them to the effect that the tombs were not then prejudicial to the public health; and the order as to that cemetery was rescinded. There has been no change in " the structure or condition " of the tombs, since 1853.

At a meeting of the corporation on January 16, 1871, one hun dred and ten pews were entitled to representation by votes, and it was voted, by forty-seven in the affirmative to twenty-eight in the negative, to apply to the legislature for the passage of an act to sell the land of the corporation, with the church building thereon, and give the purchaser a good title free of any trusts.

shall be assumed by, and be binding upon said corporation, and they shall be liable for the due observance thereof."

SECTION 5 provided that the act should take effect on and after April 4, 1831, " provided that the proprietors of said church do, and shall at their annual meeting, to be held on said day, accept and adopt the same."

SECTION 6 provided " that the said act may be altered or repealed at the pleasure of the legislature."

Application was made accordingly, and thereupon the legislature passed the St. of 1871, *c.* 221, which is printed in the margin.*

---

* The St. of 1871, *c.* 221, passed April 25, 1871, and entitled " an act to authorize Trinity Church in Boston to sell land, and for other purposes," was as follows :

" SECTION 1. Trinity Church in the city of Boston may sell and convey, at private or public sale, the parcel of land on the easterly side of Summer Street in said Boston upon which its church now stands, together with the buildings thereon standing, and may give to the purchaser or purchasers good title free of any trusts.

" SECTION 2. Before such sale, the pews in said church and the rights in tombs under the same shall be appraised by three or more disinterested persons chosen for that purpose by the proprietors of pews, and the money arising from the sale of said land and buildings shall be applied so far as may be necessary to paying the debts of said corporation and the appraised value of said pews and rights in tombs, except as hereinafter provided, or said Trinity Church may make agreement with any owner or owners of rights in tombs for the purchase and extinguishment of said rights.

" SECTION 3. After paying said debts and all sums due under this act to the proprietors of said pews and rights in tombs, the money arising from said sale may be used for the purpose of purchasing land in the city of Boston and building a new church thereon, to be held upon the same trusts, if any, as the estate and church in Summer Street are now held, and said corporation may make any contracts with any proprietors of pews in the church in Summer Street by which said proprietors may receive pews in such new church in exchange for their pews in the existing church upon such terms as may be agreed upon, and the pews in such new church not so disposed of shall be offered for sale at public auction, or may be disposed of as the proprietors of said church shall deem expedient.

" SECTION 4. After the appraisal of said rights in tombs, or in any event if such appraisal of pews and rights in tombs shall not take place within six months from the passage of this act, the wardens and vestry of said church shall give notice to all persons interested in each of said tombs, either by serving such notice upon one owner of each tomb or by publishing the same for two successive weeks in at least two newspapers printed in the city of Boston, that all bodies and remains interred in tombs under said church, the same having become dangerous to public health, must be removed within three months after the service of said notice or after said first publication, and in case said bodies or remains shall not have been removed within said three months, said wardens and vestry may at the expense of said church cause the same to be removed and interred in some suitable place, but in case the said appraisal of said rights in tombs shall have been made, said wardens and vestry may deduct from the

On May 6, 1871, these plaintiffs served on the corporation a protest against the acceptance of the statute, on the following grounds : ·

Because the land was conveyed on conditions limiting its use to church purposes, or upon trusts which require its perpetual use for a place of worship.

Because the statute impairs the obligation of contracts created by the deeds and acts of the church in selling tombs and granting rights of interment and perpetual easements under the church building.

Because the declaration in the statute, that the tombs have become dangerous to the public health, was unauthorized, and is inconsistent with the above recited proceedings of the corporation concerning the cemetery in 1855.

Because its acceptance would impair the obligation of the contracts entered into by the church on accepting the devise of William Price, requiring perpetual care of his tomb under the church building.

The corporation, nevertheless, at a meeting held on May 8, 1871, at which one hundred and twenty pews were entitled to representation by votes, and at which the said protest was read, voted, by thirty-seven in the affirmative to three in the negative, to accept the statute; also voted " that the wardens be authorized and directed to make such contracts and conveyances as may be advisable, for the purpose of effecting a sale of the land and buildings of Trinity Church, provided that such contracts and conveyances be not concluded until the vestry have approved of the same ; " and chose appraisers of the pews and tombs, pursuant to the statute; and the said protest was entered on the records of the corporation.

---

appraised value of the tombs, from which they shall have removed bodies as aforesaid, so much thereof as shall be necessary to pay the expense of such removal and of the purchase and preparation of suitable places for the interment of said bodies.

" SECTION 5. The further use of the tombs under said Trinity Church for interments is hereby prohibited.

" SECTION 6. This act shall take effect upon its passage."

It was alleged in the bill, and admitted in the answer of the corporation, that Trinity Church is, and was at the time of all the before recited proceedings of the corporation relative to a sale of the land and church building, a parish of the Protestant Episcopal Church for the diocese of Massachusetts, and subject to the canons thereof; that at the last general convention of said Protestant Episcopal Church, held in 1868, a canon was passed that "no consecrated church or chapel shall be removed, taken down or otherwise disposed of, for any unhallowed, worldly or common use, without the previous consent of the bishop, acting with the advice and consent of the standing committee of the diocese in which such church or chapel may be situate;" that the church building in question is a consecrated church within this canon; and that the said proceedings of the corporation have been conducted without the previous consent of the bishop.

*E. Blake,* for the plaintiffs. The defendants hold the land on a condition and a trust, which will be violated by a sale. *In re New South Meeting-house,* 13 Allen, 497. *Canal Bridge* v. *Methodist Religious Society,* 13 Met. 335. *Gray* v. *Blanchard,* 8 Pick. 284, 288. *Wright* v. *Wilkin,* 2 B. & S. 232. *Rawson* v. *School District in Uxbridge,* 7 Allen, 125, 130. *Parker* v. *Nightingale,* 6 Allen, 341. *Whitney* v. *Union Railway Co.* 11 Gray, 359. *Merrifield* v. *Parritt,* 11 Cush. 590, 598. *Glass* v. *Hulbert,* 102 Mass. 24, 28. Herman on Estoppel, §§ 211, 229, 376.

No change in the tenure of the land can be made without unanimous consent of the pewholders. Angell & Ames on Corporations (9th ed.) §§ 391, 393, 499 note, 500. Cooley on Constitutional Limitations, 96. Dwarris on Statutes, 498.

The law protects tombs and rights of interment from sale or disturbance. Gen. Sts. c. 28, §§ 6, 12; c. 43, § 90. *Commonwealth* v. *Viall,* 2 Allen, 512. *Beatty* v. *Kurtz,* 2 Pet. 566.

By the terms of Price's will, the corporation was bound to keep his tomb perpetually in its present locality under the church building. *Attorney General* v. *Trinity Church,* 9 Allen, 422. Boyle on Charities, 45. *Masters* v. *Masters,* 1 P. W 121. *Durour* v. *Motteux,* 1 Ves. Sen. 320. *Doe* v. *Pitcher,* 3 M & S. 407.

The St. of 1871, *c.* 221, which is a private act, is invalid. As to the pewholders, in exercising a judicial power; Cooley on Constitutional Limitations, 91, 274; Dwarris on Statutes, 488, 490; *Wilkinson* v. *Leland,* 2 Pet. 627, 658; *Norman* v. *Heist,* 5 W. & S. 171; *Ervine's appeal,* 16 Penn. State, 256; *Brown* v. *Hummel,* 6 Barr, 86; *Talbot* v. *Hudson,* 16 Gray, 417; *Emery's case,* 107 Mass. 172. As to the tombs; Dwarris on Statutes, 444; Cooley on Constitutional Limitations, 595; *Coates* v. *New York City,* 7 Cowen, 585; *Brick Presbyterian Church* v. *New York City,* 5 Cowen, 538; *Russell* v. *New York City,* 2 Denio, 461; *Commonwealth* v. *Tewksbury,* 11 Met. 55; *Talbot* v. *Hudson,* 16 Gray, 417; *Dingley* v. *Boston,* 100 Mass. 544, 556; Gen. Sts. *c.* 28, §§ 8, 9; *Simonds* v. *Simonds,* 103 Mass. 572. A private act does not bind third persons by recital of facts; and so the plaintiffs may show that in 1855 the corporation denied the cemetery to be a nuisance or to be likely to become one.

*B. R. Curtis & G. O. Shattuck,* (*J. C. Ropes* with them,) for the defendants. The land is not subject to a trust or condition. *Wright* v. *Wilkin,* 2 B. & S. 232, 249. *Stanley* v. *Colt,* 5 Wallace, 119, 146, 164, 166, 167. *Merchant Tailors' Co.* v. *Attorney General,* Law Rep. 11 Eq. 35, 47; 6 Ch. 512. *Attorney General* v. *Southmolton,* 14 Beav. 357, 361. Shep. Touchst. 122. *Chapin* v. *Harris,* 8 Allen, 594, and cases cited. *Rawson* v. *School District in Uxbridge,* 7 Allen, 125, 128.

Even if subject to a trust, the legislature may authorize a sale of the land and reinvestment of the proceeds. *Stanley* v. *Colt,* 5 Wallace, 119. *Rice* v. *Parkman,* 16 Mass. 326. *Davison* v. *Johonnot,* 7 Met. 388. *Sohier* v. *Massachusetts General Hospital,* 3 Cush. 483, 496. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 1. Resolves of 1816, *c.* 149. Sts. of 1816, *c.* 106; 1818, *c.* 161; 1832, *c.* 42; 1837, *cc.* 5, 106, 123, 134, 231; 1838, *cc.* 11, 25, 27, 88; 1851, *c.* 79; 1852, *c.* 183; 1853, *c.* 170; 1854 *c.* 208; 1855, *c.* 325; 1859, *c.* 13; 1863, *c.* 194; 1868, *c.* 137 1871, *cc.* 221, 305.

The owners of rights in the tombs cannot prevent a sale of the church building. *Stewart* v. *Clark,* 13 Met. 79. *Bryan* v. *Whistler,* 8 B. & C. 288. *McCrea* v. *Marsh,* 12 Gray, 211.

*Burton* v. *Scherpf*, 1 Allen, 133. *Windt* v. *German Reformed Church*, 4 Sandf. Ch. 471. *Kincaid's appeal*, 66 Penn. State, 411. *Wood* v. *Leadbitter*, 13 M. & W. 838. *In re Brick Presbyterian Church*, 3 Edw. Ch. 155. *Richards* v. *Northwest Protestant Dutch Church*, 32 Barb. 42; *S. C.* 11 Abbott Pract. 30; 20 How. Pract. 317. *In re Beekman Street*, 4 Bradf. 503. *Gay* v. *Baker*, 17 Mass. 435. *Daniel* v. *Wood*, 1 Pick. 102.

The act of the legislature is sufficient authority for the removal of all the tombs. *Brick Presbyterian Church* v. *New York City*, 5 Cowen, 538. *Coates* v. *New York City*, 7 Cowen, 585. *Commonwealth* v. *Alger*, 7 Cush. 53, 85. *Dingley* v. *Boston*, 100 Mass. 544, 556.

Price must be assumed to have contemplated in his will that in the course of time and circumstances it might become necessary to remove his tomb. It was necessary to do so on the rebuilding of the church edifice in 1828–9, and has become so now again. Otherwise, it may be questioned whether the provision in his will for its preservation is not void as tending to create a perpetuity. See *Giles* v. *Boston Fatherless & Widows Society*, 10 Allen, 355, 357.

*Curtis* argued further, that the private rights in question were in their very origin qualified by the right to remove; and that the legislature has moreover provided full compensation; citing *Fisher* v. *Glover*, 4 N. H. 180, and *Daniel* v. *Wood*, 1 Pick. 102; and cited *In re New South Meeting-house*, 13 Allen, 497, 506, 519, 520, as to how far the nature of a trust to a corporation is affected by the word "forever."

CHAPMAN, C. J.* Trinity Church was incorporated by the St. of 1830, *c.* 83, as successor of a prior unincorporated society, and held certain real estate on Summer Street in Boston, where its church edifice stood. The corporation, as well as its predecessor, was composed of the proprietors of pews, and has continued to hold its property till the present time. The titles by which it was acquired will be considered hereafter. Upon the application of the corporation, an act was passed by the legisla-

* GRAY, J., did not sit in this case.

ture on April 25, 1871, authorizing the corporation to sell this estate at public or private sale, and give the purchaser or purchasers good title, free of any trusts. So much of the avails as may be necessary are to be appropriated to pay the debts of the corporation, and to compensate the owners of pews and rights in tombs situated upon the land. The balance is to be applied to the purchase of land in Boston, and the erection of a new church thereon, to be held upon the same trusts as those upon which the present property is held. The application for the act was made by vote of a majority; the act has been accepted by a similar vote; and measures have been taken for making the sale. The purpose of this bill is to restrain the sale. We are not embarrassed by the allegation of any proposed changes in respect to doctrine, discipline, or modes of worship. Nothing is intended but to sell this property and build a new edifice in some new place in the city, which the defendants think will be more convenient and agreeable than the present one.

Changes of this sort are very common, not only in Boston, but in most of our growing cities and towns; and the legal rights of all parties intèrested in such cases have been much discussed, and are well settled. When such property is held in trust for the general purposes of the society, and cannot otherwise be conveyed, the legislature has constitutional power to authorize the trustees to convert their real estate into personal, in order that the avails may be reinvested or otherwise appropriated to the purposes of the trust. *Rice* v. *Parkman*, 16 Mass. 326. *Humphrey* v. *Whitney*, 3 Pick. 158, 164. *Davison* v. *Johonnot*, 7 Met. 388. *Sohier* v. *Massachusetts General Hospital*, 3 Cush. 483. *Pine Street Congregational Society* v. *Weld*, 12 Gray, 570. The principle is not limited to property held for parochial purposes. But we have no occasion to consider it in its application to other cases. The act now in question, and the acceptance of it by vote of a majority, gave the defendants full authority to sell the property, unless some of the objections urged by the plaintiffs constitute a legal obstacle to the sale.

The first and principal objection urged is, that, by reason of the title by which the land is held, it is necessary, or is at least

a duty which the court will enforce, that the defendants should hold it perpetually.for the purposes to which it is now devoted It becomes necessary therefore to look into this title.

The greater part of the land was conveyed by Leonard Vassall to John Barns, John Gibbins and William Speakman, on April 30, 1730, in trust to cause a building to be erected thereon for the performance of divine service according to the rubrics of the common prayer book of the Church of England as by law established ; and if the house should not be erected within five years, Vassall was to be entitled to a reconveyance on repayment of the consideration. The house was erected, and Gibbins and Speakman conveyed the property to Peter Luce and three other persons, " being a committee duly chosen by sundry persons who advanced divers sums of money towards erecting and building a new church in Summer Street." The grantees were, by the terms of the deed, to hold the property till they should be reimbursed for moneys advanced, and what should be further advanced to finish and complete the church ; and were then to convey it to the vestry and wardens of the church. This deed is dated February 28, 1735, and expressed to be in trust. On December 10, 1739, Luce and others conveyed the property to the vestry and wardens, naming them, and to their successors in office. The deed recites the conveyances from Vassall downwards, and recites that the grantors have been paid and indemnified, by the sale of pews and otherwise, for moneys advanced. The *habendum* is : " In trust nevertheless, and upon condition always, that the said edifice or building, called Trinity Church, and the land aforesaid whereon it stands, and before conveyed, shall from henceforth and forever hereafter be converted, improved, appropriated and made use of for the public worship of God according to the rubric of the common prayer book used by the Church of England as the same is settled and established by an act of the parliament of England, made in the first year of the reign of Queen Elizabeth, entitled ' an act for uniformity of common prayer and service in the church, and administration of the sacraments,' and another act of the parliament of England, made in the thirteenth year of the reign of King Charles the Second, entitled ' an act for the uni-

formity of public prayers and administration of sacraments and other rites and ceremonies, and for establishing the form of making, ordaining and consecrating bishops and deacons in the Church of England;' and to be converted, improved and used to and for no other use or purpose whatsoever." This is the only clause in the deed that we need to consider here. It is relied upon by the plaintiffs as showing that the wardens and vestry took their title upon condition subsequent; and that by the contemplated sale the title would be forfeited.

The words "upon condition" are appropriate words for creating a condition, but they do not of necessity create such an estate. *Stanley* v. *Colt*, 5 Wallace, 119, and cases there cited. If it is such an estate, in this case, the forfeiture would be to the grantors or their heirs. But the grantors were merely a committee who had taken their title in trust for the society; and if it were to come back to their heirs by forfeiture, it must be held by them in trust for the society, and thus would merely be turned into a trust estate. Therefore nothing could be gained by a forfeiture, or by treating it as an estate on condition. Taking into consideration the title of the grantors, the purposes of the grant, and the fact that the expression is "in trust nevertheless, 'and upon condition always," the fair construction of the instrument is, that the parties intended the title to be in trust, and that the words "upon condition" were not used in their technical sense. These words do not always create a condition. *Merchant Tailors' Co.* v. *Attorney General*, Law Rep. 11 Eq. 35. *Wright* v. *Wilkin*, 2 B. & S. 232. *Attorney General* v. *Southmolton*, 14 Beav. 357, 361. See also *Chapin* v. *Harris*, 8 Allen, 594. But we regard the case of *Rawson* v. *School District in Uxbridge*, 7 Allen, 125, as decisive of the question; the purpose for which the property is to be used being in its nature general and public in this case as it was in that case, and the language of the deed not indicating an intent that the grant is to be void if the declared purpose is not fulfilled, but rather indicating a trust to be enforced if the grantees shall attempt to violate it. The case is plainly distinguishable from *Austin* v. *Cambridgeport Parish*, 21 Pick. 215.

The trust was set forth with great particularity, as was common in those times. Perhaps in the estimation of the parties thereto a departure from any of the forms of worship therein prescribed, in any particular, would have been regarded as a breach of the trust; but the whole current of our decisions is adverse to such an idea. After the Revolution, their relations to the British government, the acts of parliament, and the Church of England, were changed. Under our laws, it was no breach of the trust for the society to connect themselves with the Protestant Episcopal Church of this country, and cast aside the requirements of the acts of parliament referred to in the deed, so far as they interfered with their duties as citizens of the United States and members of the Protestant Episcopal Church established here. The plaintiffs admit that the society did not by that change violate the trust. Until March 1831, the society was unincorporated; but at that time it obtained an act of incorporation, and has since held the property and acted under the charter. In respect then to the method of obtaining its funds by voluntary contribution, its organization as an unincorporated society, and its becoming incorporated afterwards, its history resembles that of numerous religious societies in this Commonwealth; and the well established principles that have been applied to them must be applied to this case. There is nothing in the title by which the property is held, to prevent the society, under the legislative act, from selling the property for the purposes set forth in the act.

It is further objected that the votes to accept the act and make the sale were not unanimous, but were only passed by a mere majority, and that those who are in the minority, being pewholders, have each a right to interpose and prevent the sale. As members of the corporation, they are bound by the votes of the majority; but they urge their distinct rights as having titles to several of the pews. It is contended that the well recognized doctrine, that the legislature itself has no constitutional power to transfer one person's property to another without his consent, applies to the case of a pewholder. But pews are held by very peculiar titles. They constitute a qualified and usufructuary

right, being a right to occupy under certain restrictions. *Gay* v. *Baker*, 17 Mass. 434. *Wentworth* v. *First Parish in Canton*, 3 Pick. 344. *Howard* v. *First Parish in North Bridgewater*, 7 Pick. 138. *Daniel* v. *Wood*, 1 Pick. 102. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1. *In re New South Meeting-house*, 13 Allen, 497, 502. They are held subject to the right of the proprietors of the meeting-house — a right which it is so often found necessary to exercise in this country — to alter the internal structure of the house and remodel the pews, or to enlarge or remove it, or sell it in order to build anew. By the Gen. Sts. *c.* 30, §§ 35, 36, ample provision is made for enabling proprietors of meeting-houses to make these changes, and the right of pewholders to compensation is secured. But when the corporate body determines to make the sale or alteration, it is not necessary to consult the pewholders, as such, in respect to their right to do so. The right of property in pews is not such as gives the owners any authority to object to the proceeding.

It is also objected that there are certain tombs under the church, which the defendants are bound to preserve and have no right to remove, disturb or abandon. The fourth section of the act declares that the bodies interred in the tombs have become dangerous to public health, and directs that they shall be removed within a certain time ; and the fifth section prohibits their further use for interments. Rights of burial under churches or in public burial grounds are peculiar, and are not very dissimilar to rights in pews. They are so far public that private interests in them are subject to the control of the public authorities having charge of police regulations. Cooley on Constitutional Limitations, 594, and cases there cited. It often becomes necessary to remove not only tombs, but burial grounds. In *Brick Presbyterian Church* v. *New York City*, 5 Cowen, 538, land had been conveyed for a church and cemetery, in 1766 ; in 1823, the legislature prohibited the use of the cemetery ; and it was held that they had a constitutional right to do so. In *Coates* v. *New York City*, 7 Cowen, 585, an act which had been passed in respect to Trinity and other church yards, authorizing the city to enact by-laws in restraint of burials, was held to be constitutional ; resting

upon the same ground as the right of the legislature to provide for the suppression of nuisances and make provision for the public health.  In *Windt* v. *German Reformed Church*, 4 Sandf. Ch 471, it was held that the sepulture of friends and relatives in a cemetery belonging to a religious society confers no right or title upon the survivors, and they cannot prevent a sale of such cemetery by the corporation and the removal of the interred remains, when such removal is in all respects conducted according to law. In *Kincaid's appeal*, 66 Penn. State, 411, the Methodist Episcopal Society in Pittsburg had purchased a piece of ground for a grave yard.  The city grew, and became closely built up around the grave yard, and it became a nuisance.  The legislature then passed an act for its sale and the removal of the bodies. The constitutionality of the act was discussed; and the supreme court of Pennsylvania held it to be valid.

This court has had occasion to discuss the power of the legislature to pass laws which belong to the class of police regulations, and which include laws for the preservation, care and removal of cemeteries and tombs, and the disposal of the remains of the dead; and it is held here as well as in other states, that all individual rights of property are subject to laws of this character.  The principle was fully stated by Chief Justice Shaw in *Commonwealth* v. *Alger*, 7 Cush. 53.  See also *Fisher* v. *McGirr*, 1 Gray, 1; *Baker* v. *Boston*, 12 Pick. 184; *Vandine, petitioner*, 6 Pick. 187; *Nightingale, petitioner*, 11 Pick. 168; *Salem* v. *Eastern Railroad Co.* 98 Mass. 431; *Dingley* v. *Boston*, 100 Mass. 544.  It has been usual for our legislature to pass laws for the preservation of the public health, and the suppression of what it has deemed to be nuisances, in application to a great variety of cases.

Under the authority of the act cited above, the defendants are justified in removing the bodies and remains interred under their church, as therein directed.  The act is peremptory, and renders all reference to the opinions expressed by committees and physicians at a prior time immaterial.

There are other causes which are obviously sufficient to authorize the removal of bodies and tombs placed under a church.  The

edifice may be consumed by fire, or otherwise destroyed; or it may decay; or the place may become unsuitable for such a building; or for various other reasons it may be proper to abandon or sell it. And in such cases it would be improper to leave the tombs and the remains deposited in them; obvious propriety would require that the remains should be removed to some suitable place; and, as the owners of the tombs and the friends of the deceased have no title to the lands, but only an interest in the structures and in their proper use, the public authorities do not violate their rights of property, if proper provision is made for compensation or substitution.

The defendants contend that the rights in tombs are mere licenses, and revocable at any time, as in *McCrea* v. *Marsh,* 12 Gray, 211; *Burton* v. *Scherpf,* 1 Allen, 133; *Wood* v. *Leadbitter,* 13 M. & W. 838. But it is not necessary to decide that question, as the legislative act justifies this removal of the tombs.

As to the tomb called the Price tomb, it appears to be held by the same usufructuary right with the other tombs, and to be subject to the same liability to removal with them. The legal title to the land on which it stands is in the defendants.

The canons of the Protestant Episcopal Church, which are referred to in the bill, requiring the defendants to obtain the consent of the bishop and standing committee, for removing, taking down, or otherwise disposing of a church, do not affect the legal title to the property held by these defendants under the deeds above mentioned. Titles to property must be determined by the laws of the Commonwealth. The canons are matters of discipline, and cannot be enforced by legal process.

Nor have we any occasion, in this suit, to consider whether the defendants will act wisely, and for the best interests of all parties interested, in exercising the discretionary power which is intrusted to them. It is sufficient that they have thus far proceeded in conformity with the principles of law.

*Bill dismissed.*