## FIRST CONGREGATIONAL PARISH OF WEST BOYLSTON *v.* INHABITANTS OF WEST BOYLSTON, ET AL.

Worcester, October, 1907.

*Town and Parish — Ancient Grant — Municipal and Parochial Uses — Title on Separation — Attempted Acquirement by Abutters of Easements over Common.*

This is a petition for registration of title to the old Common at West Boylston, involving a controversy as to ownership of the fee between the First Parish and the town, the determination of certain rights claimed by the public, and of certain rights of way claimed as appurtenant to their respective estates by the owners of certain adjoining lots.

It appears from the records of the Second Precinct in Boylston, Sterling and Holden that, " In the year of Our Lord one thousand seven hundred and ninety-two a number of the inhabitants in the westerly part of Boylston and the southerly part of Sterling, the easterly part of Holden, together with a few from the northerly part of Worcester, assembled themselves together at different times to consider the propriety and expediency of a new town or.parish being formed from the several quarters of the towns above named, and were generally agreed that such a measure would be practical and of common utility.   The question of whether they should first petition for incorporation or provide them· selves with the necessary accommodations for enjoyment of public worship among themselves, was then considered, and the result was it would be felt greatest wisdom first to establish the latter.   Several spots were then viewed and pointed

out as being suitable whereon to erect a meeting house. At length it was agreed that a portion of the lands belonging to Capt. Joseph Bigelow, Abel Bigelow and John White, ought to be appropriated for public use, which they generously gave for the purpose of erecting a meeting house upon and for other necessary accommodations, and secured the same by deeds unto Ezra Beaman, Esq., Abel Bigelow, Ezekiel Beaman, Josiah Beaman and Samuel Estabrooks, acting in their behalf for the common benefit of the society. . . . From this time they formed themselves into a society, and the more readily to transact their business, as a part of the meeting at the schoolhouse near Reuben Keyes in December 17, 1792, they first chose David Goodale for their Clerk, second chose Joseph Estabrooks for a Moderator, third, Ezra Beaman, Abel Goodale, Ezekiel Beaman and Israel Moore, a committee for the purpose of managing their prudential affairs, which they denominate their Parish Committee. Fourth, voted to build a meeting house. Fifth, voted that it be set on or near the northerly part of Abel Bigelow's land. Sixth, Ezra Beaman, Ephraim Beaman and . . . chose a committee of ways and means so-called for the purpose of pointing out and securing necessary ways and roads. Seventh, Samuel Estabrooks, Ephraim Beaman, Josiah Beaman, Ezra Beaman and Israel Moore, chose a committee to secure land and lay out timber for a meeting house. Then the meeting was adjourned to the 31st instant at one o'clock P. M., at which time they again met, and the Committee on Ways and Means reported the expediency of a road from the meeting house to the new schoolhouse a little north of the same through Joseph Bigelow's land, and another from said spot to Ezra Beaman's through said Beaman's and Bigelow's land, and that they might be had free of expense except the building; a good well on each side of the road first mentioned, so far as it extends through said Bigelow's improved land to said first mentioned road being 4 rods wide

and the other 3.    Second, the committee for the purpose
exhibited a plan for a meeting house 58 feet long and 45
feet wide, which was framed 58x46, which was accepted.
Third, voted to proceed to build the said house the year
ensuing, and that Ezra Beaman, Ephraim Beaman, Abel
Goodale and Joseph Beaman and Samuel Estabrooks be a
committee to manage the work."

Deeds of the land in question were made and acknowl-
edged by John White, Joseph Bigelow and Abel Bigelow
in 1794, each in the following form:

" To all people to whom these presents shall come:
Whereas divers persons, inhabitants of the towns of Boyls-
ton, Sterling, Holden and Worcester, having it in contem-
plation to make application to the Legislature of the Com-
monwealth of Massachusetts for the purpose of getting a
parish incorporated and to erect and build a meeting house
for public worship in Boylston in the county of Worcester,
and have agreed to erect the same on a tract of land on the
easterly side of the road leading from Captain Bigelow's to
Lancaster; Now know ye that I, . . . of Boylston aforesaid,
for divers good causes and considerations, me thereunto
moving, as well as for the sum of five shillings paid by Ezra
Beaman, Esq., Paul Goodale, yeoman and Ephraim Bige-
low, gentleman, all of Boylston aforesaid, Josiah Beaman
of Sterling and Samuel Estabrooks of Holden, yeoman, and
all in the County of Worcester, the receipt whereof I do
hereby acknowledge, do hereby give, grant, sell and convey
unto the said Ezra Beaman, Paul Goodale, Ephraim Bea-
man, Josiah Beaman and Samuel Estabrooks and their heirs
forever for the purpose of erecting a meeting-house and
accommodating the same with a common, and for no other
purpose, the following tract of land . . . (description)
. . . To have and to hold the same to the above-named per-
sons in trust for the use of the intended parish as aforesaid,
and for no other purpose as aforesaid forever."

The deeds were not recorded until January, 1809, but the meeting house was built upon the land in question, and dedicated January 1, 1795.

By Chapter 10 of the Acts of 1796 certain lands in the towns of Boylston, Sterling and Holden, including the premises in question, were incorporated into a Precinct by the name of the Second Precinct in Boylston, Sterling and Holden. By act of January 30, 1808, said precinct was, through its own efforts and at its own expense, incorporated into the town of West Boylston. Both precinct and town meetings were held in the meeting house until it was destroyed by fire in 1831. The precinct in 1806 by vote set out rows of trees on the bounds of the Common and the town paid for the care of, and repairs to, the meeting house and also paid the minister's salary. In 1819 a Baptist church and society was formed. There is no record of a corporate organization, but land was acquired and a Baptist meeting house erected on land facing and abutting on the Common. The town continued to hold its meetings in the old meeting house, and in 1823 the town, by vote in town meeting and by deed received from one Temple, altered the boundaries of the Common by exchanging lands with said Temple who was an adjoining owner to the north, back of the meeting house.

In 1830 there occurred a division in the church, resulting in the organization of a Liberal or Unitarian Society. On March 8, 1830, a petition was addressed to a local justice of the peace by certain inhabitants of West Boylston to issue a warrant calling a meeting for the purpose of being organized into a religious society by the name of the First Liberal Society in West Boylston. The warrant was issued accordingly, and on March 18, 1830, the society was organized. The first meeting was held in the Beaman Tavern and thereafter at the Centre School House.

In the summer of 1831 the old meeting house burned down. The First Congregational Parish voted not to rebuild

on the Common, but instead to erect a meeting house down in the valley. This was done, and the meeting house so erected was thereafter locally known as the brick meeting house, the Church Society there worshipping retaining the name and organization of The First Congregational Society, and its correlative temporal body that of The First Congregational Parish of West Boylston. (See six paragraphs *infra.*) Meantime the Liberal Society, at a meeting on September 19, 1831, called to see what method the society would take to locate and build a meeting house, voted to build a meeting house on the old Common. This was accordingly done and the meeting house was erected substantially on the site of the old First Parish meeting house which had just been burned; the building being contracted for in March, 1832, and erected prior to March 18, 1833. In 1833 the town disposed of the bell and what other articles remained from the destruction of the old meeting house. In 1834 the Liberal Society was incorporated under the name of the First Liberal Congregational Society in West Boylston, and thereafter the Liberal Society meeting house was regularly used by that society for religious services for some thirty or forty years. After about 1875 it was used for services at irregular intervals only, and the building fell into dilapidated condition; but was painted and repaired to some extent from time to time by the neighbors and by private subscription among the citizens. About 1898, the site of the brick meeting house having been taken by the Metropolitan Water Board, the Liberal Society and the First Congregational Parish came together again as the present petitioner corporation; deeds were made, the old meeting house was torn down, and a new church building erected in its place on the old Common.

Meantime public streets were laid out across the Common dividing it into three portions; a triangular tract in front of the church building, another triangular tract between

Worcester street on the west and the cemetery on the east, and a generally rectangular parcel on the west side of Central street. A strip of the old Common along the extreme easterly side adjoining the burying ground was taken by the town for cemetery purposes, and no money was paid therefor. Except and unless for this taking, however, there is no evidence of any control exercised by the town over the Common since the erection of the meeting house of the Liberal Society. The Liberal Society voted at various times to care for " its grounds," and to " sell their grass on their common within their lines," and passed other votes in relation to protecting " their property."

The Common has always remained open and unfenced. The owners of estates abutting on the Common on the westerly and southerly sides have built houses facing the Common, and for over fifty years have used, as the sole means of access to their lands, a way leading from the public streets along and substantially parallel to the southerly and westerly boundary lines of the Common, and distant about forty feet therefrom, obtaining access thereto by crossing from their respective lots as occasion might require. This way has been used by the abutting owners, and by all persons having occasion to go to and from their respective estates, for all the ordinary purposes of a way, and has been, and is, the only means of access to such estates. The rest of the Common outside of the tract used in immediate connection with the meeting house, which is clearly defined by the driveways, has been used as a town common is ordinarily used.

The first question in this case is as to the effect of the 1794 deeds. It seems to me that they clearly effected a conveyance of the land in question to the individuals therein named as grantees in fee simple, but in trust. Newhall v. Wheeler, 7 Mass. 189; Stearns v. Palmer, 10 Met. 32; Attorney-General v. Federal Street Meeting-House, 3 Gray

1, 48; Wells *v.* Heath, 10 Gray 17; Sohier *v.* Trinity
Church, 109 Mass. 1; Old South Society *v.* Crocker, 119
Mass. 1; Packard *v.* Old Colony Railroad, 168 Mass. 92.
The nature of the trust was temporary, however, to provide
for public worship " while getting a parish incorporated."
It was not an active continuing trust as to which there should
have been a provision " to preserve a succession in the trus-
tees " as in Old South Society *v.* Crocker, 119 Mass. 1, and
similar cases. No successors were needed or contemplated.
The intent of the parties appears both from the deeds and
from the vote. The grantees were acting solely as a commit-
tee of the inhabitants for the benefit of the precinct which
was about to be formed. Their object was the formation of
a new town or parish as a practical measure of common
utility. They thought that the lands in question ought to be
appropriated for public use for the purpose of erecting a
meeting house and other necessary accommodations for the
new territorial organization; but the owners generously
gave the land for those purposes acting for the common
benefit of the intended society. The trust was almost a
naked trust to convey to the precinct as soon as it should
be organized. It has been argued on behalf of the respond-
ent Smith that it was a trust in the grantees and their heirs
to hold for the benefit of the parish so long as it should be
used for the purpose of a meeting house and Common and
thereafter for the benefit of the heirs of the respective grant-
ors. I am unable to find any such purpose, however, ex-
pressed in the deeds. I think the purpose plain, and that
it must be assumed that the trustees fulfilled their trust and
conveyed to the precinct after its organization. Greenough
*v.* Welles, 10 Cush. 571.

The intent of the parties is also clear that the property
was to be used for the public purposes of the new territorial
organization, " for a meeting house . . . and a common."
The most important use of a meeting house was for the con-

duct of religious services. That constituted only one use of the meeting house, however, as religion was only one, although at that time the most important, phase of ordinary communal life. There was not only no distinction between the church and state, but the average community was a single entity for every purpose for life. The worship of God, the holding of property, the ordering of affairs, and protection against the enemy, were all matters calling for common action at one meeting. In the early days one call and one set of records sufficed for all purposes. Later distinctions grew up, and the community life took on separate organization as to its several separate phases, and still later, not only were these separate phases represented by different persons, but they became separate corporations or quasi-corporate bodies; Baker v. Fales, 16 Mass. 488; Brown v. Sudbury, Land Court Decisions, p. 225, ante. This was true of the church as well as of the proprietors of common fields, municipal governments and militia organizations. At the time of the 1794 deeds the neighborhood in question was just gathering itself into the simplest form of local organization, forming itself out of the fringe of the four larger communities which cornered at this point, into a village or precinct having practically all the attributes and qualifications of a town except that of representation, and ready to become a town as soon as the development might warrant. At first, all of the meetings were held for all purposes under one call. Later, there were two calls, one for those qualified to vote in church matters, and the other for those only qualified to vote in town affairs. There was no church organization capable of holding property. Parish and church were one, and first the precinct, and later the town, exercised full control over the property in question, voting some of it (directly behind the meeting house) to John Temple. This strengthens the presumption of a grant from the trustees to the precinct. Of course, such a presumption is a pure fiction.

All fictions are imaginary whether legal or otherwise; yet the presumption that the trustees did that which they ought to have done is a perfectly normal one, whether it rest on a fictitious presumption or on estoppel.

The next question is as to the effect of the separation of the churches after the fire of 1831.  The petitioner's contention has been that the majority members of the original church separated from the parish, and went down into the valley and built the brick church, leaving the minority members, who subsequently became the Liberal Society, remaining and constituting the original church, and therefore retaining title to the property.  This does not appear to be in accordance with the facts, however.  In most of the cases resulting from the Liberal movement of that time (of which nearly all have been cited by either the petitioner or the respondents) the decisions of the court have generally turned upon the single question as to which body represented the original parish.  Much to the disappointment of the ecclesiastical controversialists of the time, the courts refused to recognize the " church " as a property owning body, or to pass judicially on whether the Orthodox or Unitarian element constituted the true church in each particular case. The legal test adopted seems to have been simply " who owned the property," whether the seceding body constituted the majority or the minority, the Orthodox or the Liberal element.  The cases are fully cited in the briefs.  See Stebbins v. Jennings, 10 Pick. 172;  Baker v. Fales, 16 Mass. 488;  Avery v. Tyringham, 3 Mass. 160;  Brunswick v. Dunning, 7 Mass. 445;  Burr v. Sandwich, 9 Mass. 277; Milford v. Godfrey, 1 Pick. 91; Medford v. Pratt, 4 Pick. 221;  Woodbury v. Hamilton, 6 Pick. 101;  Lakin v. Ames, 10 Cush. 198.  The leading cases may also be found with some pungent doctrinal commentary in Buck's Ecclesiastical Law.  In the case at bar, however, the Liberal Society had been fully organized, though not incorporated, before the old

meeting house burned down, and was then considering what method the Society would take " for to provide for preaching." It already constituted as much a separate society as did the prior Baptist organization. When the First Congregational Society moved down into the valley and built there, title to the Common still remained in the town, being moreover a title which under the deeds of 1794 was held for purposes wider than those simply of religious worship. Then came the Eleventh Amendment to the Constitution in 1833, and the incorporation of the First Liberal Society in 1834.

Some confusion arises in this case from the way in which the terms " Church," " Society " and " Parish " have been used. It should not be forgotten, however, that originally the Church was solely and only the spiritual body, the temporal organization being the Society, and the Parish the purely territorial designation of a public corporation, governmental in character though religious in nature, and so far as church purposes were concerned, an equivalent or substitute for district, precinct, or town. At first every citizen had to be a church member, and all interests were the same. There finally came a time, however, when not only had Church and State become divorced, and the Church members grown to be but a small proportion of the general body of worshippers, but their interests differed so radically that it became necessary to confer corporate and property owning powers on the church itself. Acts of 1887, Chapter 404. So that now we have the " Church " calling itself the " Society " and the designation " Parish " limited to the business organization of the original first Congregational body, which is, however, the legitimate successor, in property rights as well as in name, to the original First Parish. While " parish " was originally a territorial designation, however, it early reacquired its normal significance of a religious division of the body politic, and poll parishes, consisting of particular persons rather than of a particular ter-

ritory, were created. They were "regularly set off" by public statute, however; and were not mere voluntary organizations either of Churches or Societies. Acts of 1718, Chapter 1; Acts of 1786, Chapter 10; Minot v. Curtis, 7 Mass. 441; Milford v. Godfrey, 1 Pick. 91, 98. After the separation of the town and parish I rule that the meeting house with the lands reasonably appurtenant thereto vested in the original First Parish, while the rest of the common remained in the town as a municipal corporation. Stebbins v. Jennings, 10 Pick. 171, 185; First Parish v. Jones, 8 Cush. 184.

There remains only the matter of easements. It is clear that on the facts in this case no rights can have been acquired in the public generally. The only possible question is with regard to the rights of way claimed by the various abutting owners as appurtenant to their respective estates. I think, however, that no such rights could as a matter of law be acquired under the circumstances in this case. The underlying principle of the acquisition of an easement by prescription is the same as that of a fee by adverse possession, namely: estoppel. It is very hard to say how the owner of the fee in the Common, whether parish or town, could have told when any person walked or drove on to it, whether he was there in the exercise of an undoubted right, or attempting to acquire a specific private easement by user, or what the owner could have done to stop it, if it had known. McKay v. Spaulding, 184 Mass. 140.

What would happen in the highly improbable event of a sale of the meeting house lot, or of the Common being sold or given up by the town, without the ways around the south and west sides being first laid out as public ways, need not be considered at the present time or in this case. See Rawson v. Uxbridge, 7 Allen 125; Gordon v. Taunton, 126 Mass. 349; Sears v. Atty. Gen., 193 Mass. 551; First Church, Petitioner, Land Court Decisions, p. 209, ante.

In conclusion a quotation from Buck's Ecclesiastical Law may perhaps be pardoned. "Whatever further materials may remain in some of the old towns of the Commonwealth for these unwieldy suits, it is to be hoped that they may not appear in the courts, for judges have reason enough to regret, above all men, the ancient union between Church and State in Massachusetts."

Decree for petitioner to portion north of the driveways, and for the town, on motion for substitution, for the portion south of the driveways.

Sheehan & Cutting, for petitioner.

C. H. Sibley, H. L. Thompson, W. H. Whiting for respondents.