### ARGUED AND DETERMINED

#### IN THE

# SUPREME JUDICIAL COURT

#### OF

# MASSACHUSETTS.

---

OLD SOUTH SOCIETY IN BOSTON vs. URIEL CROCKER & others. ATTORNEY GENERAL vs. OLD SOUTH SOCIETY IN BOSTON.

Suffolk. June 22. — Oct. 23, 1875. GRAY, C. J., did not sit. AMES, J., absent.

A gift for the erection of a house for public worship, or for the use of the ministry, may constitute a public charity, if there is no definite body, for whose use the gift was intended, capable of receiving, holding and using it in the manner intended. But when there is a body, or a definite number of persons, ascertained or ascertainable clearly pointed out by the terms of the gift to receive, control and enjoy its benefits, it is not a public charity, however carefully and exclusively the trust may be restricted to religious uses alone.

In 1669, land was conveyed to certain persons named "and to such as they shall associate to themselves, their heirs and successors forever, for the erection of a house for their assembling themselves together publicly to worship God, as also the erection of a dwelling-house for such minister or ministers as shall be by them and their successors from time to time orderly and regularly admitted, for the pastor or teacher to the said church or assembly, and for the accommodation of the said dwelling-house for the use of the minister or ministers as shall from time to time be chosen as aforesaid, and for the accommodation of the meeting-house, with convenient passages of ingress, egress and regress for the people, that shall there from time to time assemble as aforesaid, and for no other intent, use or purpose whatsoever." In 1677, the same grantor, by a deed reciting the preceding conveyance and the building of a meeting-house on the land by the grantees, conveyed an adjoining piece of land to the six survivors of the persons named in the preceding deed, "and to such as they shall have associated unto them in church fellowship, or shall be associated to them and to their heirs and successors forever, for the ends and purposes in the first above mentioned deed is fully and amply declared," "with the house already erected thereon for the use of their ministers

or ministry orderly chosen by the said society, being the Third Church of Christ in Boston, from time to time and at all times forever." Both of these deeds were for a voluntary consideration. Subsequently, the grantor by her will gave to the "Third Church of Christ in Boston" her dwelling-house which adjoined the land before conveyed, "for the use of the ministry in the said church successively forever." The deeds and other writings concerning said house were by 'ne will bequeathed to two of the persons named in the preceding deeds, as trustees for the said church, "for the end and use before declared." In 1845, the proprietors of pews in the church and their successors were made a corporation and authorised to take and hold, to the use of the corporation and its successors and assigns in fee simple, the property held by the church, "for the support of public worship, for parochial and charitable purposes in this Commonwealth, and for paying the debts of said corporation." *Held*, that neither the deeds nor the will created a public charity. *Held, also*, that the declaration of uses in the statute did not define a public charity, and that it was not the intention of the Legislature to so merge the interests of the trustees and the *cestuis que trust* as to discharge the estate from the trusts. *Held, also*, that lands so held might be sold by authority of the Legislature or of this court as a court of equity. *Held, also*, on a bill in equity praying for the sale of the property, and the application of the proceeds to the same trusts in another part of the city, that the vote of a majority of pewholders or members of the society was not of itself a sufficient authority to enable the corporation to make a sale, nor a sufficient reason to justify this court in authorizing it to be made; and that it was incumbent upon those who sought to make the change to satisfy the court that it was reasonably required for the accommodation of the society as a whole, and that the proposed change would not subject the minority to an unreasonable sacrifice of interest or convenience, or in any way work injustice to them.

THE FIRST CASE was a bill in equity by the Old South Society against Uriel Crocker, Osmyn Brewster, David Buck, Jacob Dresser, Joseph Ballard, Simon G. Cheever, E. C. Milliken, Harriet Gray, Ellen Gray, Elizabeth Coverly, Mercy Jellison and Abigail Armstrong, members of said society, alleging as follows :

On or before April 1, 1669, Captain Thomas Savage, William Davis and others joined themselves together and formed a "church of Christ," for the purpose of the public religious worship of God in the town of Boston, with the purpose to erect a meeting-house, wherein the said church might assemble themselves together publicly to worship God.

For the purpose of aiding in the establishment of and maintaining such church, Mary Norton, widow of John Norton, did, on April 1, 1669, "for divers good causes and considerations, mee thereunto mooving, and more especially for and in consideration ol that indeared affection that my late dear husband in his life time

did beare, and my selfe doe beare unto his and my assured friends, Captaine Thomas Savage, Capt. William Davis, Mr. Hezekiah Usher, Mr. Edward Rawson, Mr. John Hull, Mr. Peter Olliver, Mr. Josiah Scottow, Mr. Edward Raynsford, Mr. Richard Trewsdall, and Mr. Jacob Elliot, all of the said Boston, and in confidence of their faithfulness to performe that trust which I shall repose in them," make a deed of conveyance or trust, wherein she conveyed a certain portion or strip of land, the same being a part of her homestead lot or garden, and being situated on the corner of what is now called Milk and Washington Streets, in Boston, and being the land substantially now occupied by the old meeting-house and the block of stores on Milk Street, to the persons above named, "and to such as they shall associate to themselves, their heires and successors forever, for the erecting of a house for their assembling themselves together publiquely to worship God, as also the erecting of a dwelling house for such Minister or Ministers as shall be by them and their successors from time to time orderly and regularly admitted for the Pastor or Teacher to the said Church or Assembly, and for the accommodation of the said dwelling house for the Minister or Ministers as shall from time to time bee chosen as aforesaid, and for the accommodation of the Meeting House with convenient passages of ingress, egress and regress for the people, that shall there from time to time assemble as aforesaid, and for noe other intent use or purpose whatsoever."

Thereupon the said Thomas Savage and others proceeded to erect a meeting-house, and a dwelling house for their minister, and said church of Christ was duly organized, and adopted the name of "The Third Church in Boston."

The said church and its minister entered upon and took posses sion of the land so given, and occupied the same for a long time for a church, and dwelling-house for the minister of the church.

On June 30, 1677, the said Mary Norton by a deed, reciting the conveyance in the preceding deed, the building of a meeting-house by Savage and others, and their repairing the grantor's house and building an addition to it for a habitation for a minister at her desire, and her promise to give them the land on which they built, conveyed to said Savage and five others, the survivors of those before mentioned, "and to such as they have

associated unto them in church fellowship, or shall be associated, to them and to their heirs and successors forever, for the ends and purposes in the first above mentioned deed of April the first, 1669, is fully and amply declared," a certain additional piece of land upon which they had before built an addition to the minister's house, being the land under said addition, " for the use of their Ministers or Ministry orderly chosen by the said Society being the Third Church of Christ in Boston from time to time and at all times forever."

The will of Mary Norton, dated August 20, 1677, contained the following, among other clauses :

" *Item.* I give and bequeath unto the Third Church of Christ in Boston, my now dwelling house, with all the land belonging to the same, as it is situate near the Third Meeting House in Boston aforesaid, with all profits, privileges, rights, and appurtenances whatsoever to the same belonging or appertaining, for the use of the Ministry in the said Church successively forever. And my will further is, that the said Third Church, or some person or persons in their behalf, shall be possessed of the said House and Land, with the rights and appurtenances, at and immediately after my decease, for the reasons following : First, Because many of the particular members of the said Third Church have been large contributors to that Meeting House and Church treasure, from whom they issued. Secondly, Because of the great charge that the brethren of the said Third Church have been at in building their meeting house. Thirdly, Because I conceive it will prove inconvenient for a minister to live so near a meeting house where he doth not preach : Provided, alway, that the said Third Church, or some person or persons in their name and behalf, pay or cause to be paid unto the first Church of Christ in Boston, the full and just sum of one hundred pounds of lawful money of New England within the space of one year next after my decease ; and my will is that the payment of the said sum and tender thereof, be made at or in my now dwelling house.

"*Item.* I give and make over by these presents all my deeds and other writings that concern my said house and land in said Boston, unto Capt. John Hull and Mr. Jacob Elliot, all of Boston aforesaid, as Trustees for the said Third Church of Christ in Boston, for the end and use before declared."

Savage and others from time to time associated unto themselves various persons as composing the Third Church, and in that capacity took possession of and occupied said lands, and were and became seised in fee simple thereof, and were the managers of all the property of said church.

In 1729 the said church proceeded to remove the old meeting-house and erect a new one ; and in the new meeting-house those who had associated themselves together as the successors of Thomas Savage and others purchased pews, and the same were conveyed to them by the officers of the church, and the pew proprietors in the meeting-house, which at this time was called the Old South Meeting-house, were and became the associates and successors of Thomas Savage and others, to whom the said estates had been conveyed and devised.

At about that time the church, which had formerly been called and named the Third Church in Boston, and afterwards by reason of its situation the South Church, now began to be called the Old South Church, and the house where the church and congregation assembled together for public worship was called the Old South Meeting-house, and has been so called ever since , and the plaintiff claims and believes that the name was legally changed from the Third Church to the Old South Church, and that the Old South Church is the legal successor of the Third Church, and that the pew proprietors, as constituted at the time of the building of the church in 1729, were the regular and duly constituted successors of Thomas Savage and others, and that the lands described in said deeds and will were duly and properly vested in the pew proprietors in the Old South Meeting-house until the year 1845.

By the St. of 1845, *c.* 229, the proprietors of pews in the Old South Meeting-house were made a corporation by the name of the Old South Church in Boston, (which name was subsequently, by the St. of 1859, *c.* 88, changed to the Old South Society in Boston,) with all the powers and privileges, and subject to all the duties and liabilities contained in the Rev. Sts. *cc.* 20, 44 ; and by said act said corporation was authorized to take and hold to the use of said corporation and its successors and assigns in fee simple, all and singular that parcel of real estate situate on Milk, Washington and Spring streets, with authority to demise and lease all or any of its real estate, except the meeting-house and land under the same.

In 1800, the then pew proprietors caused the ancient house of Mary Norton to be removed, and in the place thereof erected a block of stores on Washington Street, which ever since have been let, and the income thereof applied to the paying the debts and expenses of the society and to the support of the public worship of God in the city of Boston and for charitable and parochial purposes ; and afterwards, in the year 1845, the society removed the pastor's house on Milk Street, and in the place thereof erected a block of stores, which have been leased, and the income thereof applied for the purposes aforesaid ; and afterwards the society let for business purposes the chapel owned by them, situated on Spring Lane and upon land, a part of which was originally given by Mary Norton, and a part acquired by purchase. So that at the annual meeting of the corporation in the year 1869, the entire land owned by the society, nearly all of which had been given by Mary Norton, was, with the exception of the land and yard occupied by the meeting-house, entirely occupied by stores, &c., for business purposes, and the income arising therefrom was entirely used for paying the debts and expenses of the society, and for parochial and charitable purposes.

At the meeting of the pew proprietors held in April, 1869, after due consideration, and for reasons that seemed good to the members of the corporation, a vote was passed looking towards the procurement of a piece of land upon which to build at some time a new meeting-house, which vote was followed by a series of votes and acts of the corporation, which resulted in the purchase of a lot of land and the erection thereon of a chapel and dwelling-house for the minister.

By reason of the great fire in November, 1872, the society abandoned the old meeting-house as a place of worship, and regularly worshipped in the chapel occupied by the said Old South Society ; and about that time it was applied to by the United States Government to lease the meeting-house for a post-office. The corporation voted so to do, provided their charter should be so amended that it could be done. And, upon application to the Legislature, by the St. of 1872, c. 368, the charter was amended so that the corporation could so lease the meeting-house, provided the pew proprietors should vote so to do   On December 20

1872, the pew proprietors, being called together for the purpose, voted so to lease the meeting-house, and at the same time voted to proceed at once to erect a new meeting-house, and the treasurer was authorized to borrow large sums of money to pay for the building of the same.

At a subsequent meeting held in April, 1873, at the regular annual meeting, it was voted to abandon the old meeting-house as a place of worship, and the new chapel and meeting-house were declared to be the regular place of worship. And since the last Sunday in April, 1873, the Old South Society and the Church have occupied and exclusively used the new chapel, as their regular place of meeting for the public worship of God.

In the construction of the buildings above described, upon the corner of Dartmouth and Boylston streets, the society has incurred large expenses, and has been compelled to borrow large sums of money, and is now indebted for money borrowed for said purpose, and for contracts made for the building and completion of the meeting-house, to an amount not far from $450,000 ; and by repeated votes of the society and church it has been determined, after due deliberation and for good reasons, that the new chapel, and meeting-house when it should be finished, should be the future and permanent place of worship of the Old South Society and Church ; and in accordance with this purpose and intention, they have had the pews in the old meeting-house duly appraised, have voted to sell, and have directed and ordered the standing committee to proceed at once and sell the meeting-house and land under and adjacent to the same, and to use the proceeds to pay the debt and liabilities already incurred, and for parochial and charitable purposes.

All these votes, acts and doings have been done after full and public notice in accordance with the by-laws, and with the full consent and advice of the ministers of the church and the deacons and officers thereof, and, as the plaintiff believes, of a large majority of the members and regular attendants of the Old South Church. These acts and votes have extended over a long period, and it has ever been claimed by the corporation, and, before its organization, by the pew proprietors of the Old South Meeting-house, that the land above mentioned was held by them in fee simple, without condition or limitation, and they have ever used

and employed the same for the purpose of accomplishing the evident and manifest purpose of the gift, namely, the public worship of God, and the extending and increasing the usefulness and influence of the Third Church, now the Old South Church in the city of Boston. To that end the houses of the ministers, at their request and with their consent, have been removed from the business street to the streets where the citizens are accustomed to dwell, and now the old meeting-house being situated at a great distance from the dwellings of most of the pew proprietors, and in that part of the city unoccupied by any dwellings, in order to carry out the principal purpose of Madame Norton, after due deliberation the plaintiff has decided and voted that the best interests of the church and society require that the place of worship should be removed to the land recently purchased on the corner of Dartmouth and Boylston streets, and that the old meeting-house and the land adjacent thereto should be sold and the proceeds used as before stated.

In 1874, the plaintiff petitioned the Legislature for such an amendment of its charter that the meeting-house might be leased to others besides the United States Government, and that all restrictions in that regard should be removed; and the Legislature passed an act, a copy of which is printed in the margin.*

The pew proprietors above named, a small minority of the members of the corporation, thereupon contended that the land above described could, under the said deeds and will, be only used for a meeting-house and the ministers' houses; that, should the land on which the meeting-house stands be leased, demised or used for business purposes or sold, the same would be forfeited, and revert to the heirs of Madame Norton; that the aforesaid deeds and

---

* The St. of 1874, c. 270, is as follows : " In any suit in equity brought before the Supreme Judicial Court to obtain the sanction of the said court to a sale or lease or other transfer or disposition of the Old South Meeting-house and the land under and adjacent to the same, the said court shall possess and exercise the same powers and be governed by the same principles of equity law as if the said land had not been the subject of any special legislation concerning power to lease the same.

" The meeting-house shall not be leased or sold or in any way disturbed until authority therefor shall be obtained from said court; but this shall not prevent the restoration of the pews and other changes by the United States according to the terms of the existing lease."

will created a trust, and that the corporation was the trustee, and that the use and improvement of the land aforesaid for any other purpose than for ministers' houses and a meeting-house would be contrary to the purpose, intent and letter of the trust created; and that any sale or other use of the property would be a violation of the trust; and any lease or deed of such land would pass no title and be of no effect.

The plaintiff contended that there was no condition or limitation annexed to the gift, and that any action it proposed would not work a forfeiture; that, if there was a trust created by the gift, the society as the trustee, with the church and the ministers as the *cestuis que trust*, after long and faithful trial, examination and deliberation, had decided that the Third Church, now called the Old South Church in Boston, could only preserve its power and influence, and even its existence, by removing its place of worship; that as in the lapse of time the church lot had become located in a business centre, and if used for business purposes would yield a large income or revenue, it was the proper duty of the corporation so to use the land, and expend the proceeds.in that portion of the city where the citizens dwell; that by such use of the property the intent and purpose of Mary Norton would be accomplished; that such had always been the policy of the corporation and the pew proprietors, and in pursuance thereof they had erected stores upon a portion of the land, and had used the income arising therefrom for the purposes aforesaid; and that the defendants, having for so long a time allowed the corporation, of which they were a part, to so proceed, without any attempt to restrain it before any judicial or competent tribunal, and the corporation, having been at large expense and incurred very heavy liabilities, relying upon the business capabilities of this estate to defray them, they could not now in equity and good conscience complain.

The plaintiff is informed that the meeting-house will shortly be abandoned by the United States Government, and avers that the proper time has arrived to sell the meeting-house in accordance with the votes of the corporation to that end. But the defendants still claim and aver that the corporation has no power or authority to so dispose of the property, and that such sale is in violation of the trust, and contrary to the conditions of the gift.

The plaintiff further alleged that the proposed sale was in accordance with the manifest intention and purpose of the donor, and that the defendants, by reason of their laches and acquiescence in all these acts for so long a time, and by reason of their being members of the corporation, could not now object; that the corporation has but one object, and that is to carry out and accomplish the purpose of the donor in her gifts and bequests; and that in order to accomplish the same, it was absolutely necessary to sell the land as aforesaid. And that the trust reposed in them could only be faithfully and properly executed by removing the meeting-house to some other place than the site of the old meeting-house on the corner of Milk and Washington streets, and that it could best be accomplished by selling the old building and the land under the same, and using the proceeds thereof to erect a church in the new locality.

The prayer of the bill was for a decree declaring: 1st. That the Old South Society has full power and authority to sell and convey the meeting-house and land under and adjacent thereto on the corner of Washington and Milk streets in the said city of Boston, and to give a valid title to the same. 2d. That under the deeds and will of Mary Norton there are no conditions, restrictions, limitations or trusts that will prevent the said society from giving a good and valid title to the whole or any part of the real estate given by her. 3d. That this religious society has a right to sell its meeting-house and land for the purpose of building a new meeting-house. The bill also prayed that the court would authorize and order the said meeting-house and land to be sold in accordance with the vote of the corporation, such sale to be made, and the proceeds arising therefrom to be applied to the purpose of building or paying for the building of a new meeting-house, chapel and minister's house, in the city of Boston, for paying the debts and betterments, taxes of said society, and for charitable and parochial purposes in the city of Boston, and for no other purpose; the purchaser of said property not to be responsible for the application of the purchase money; and for further relief.

Annexed to the bill were copies of the by-laws of the plaintiff corporation, and of the votes and records, referred to in the bill. These, being immaterial under the decision of the court, are omitted.

The answer alleged that by the St. of 1845, *c.* 229, by which the plaintiff was incorporated, and by the terms of which it was authorized to take and hold the Old South Meeting-house, and the lands under the same, and the deeds and devise of said land set forth in the bill, the plaintiff has been constituted trustee of a public charity, and the estates described in said bill and held by the plaintiff are held by it subject to said trusts; that the plaintiff's bill prays the instructions of this court as to the sale of a portion of said trust estate and the application of the proceeds; that the duty of maintaining the rights of the people of the Commonwealth, and of such persons as may be interested in said charity, is vested in the Commonwealth, and that the attorney general should have been made a party to this suit; that the sale proposed in the bill and the application of the proceeds in said bill proposed are in violation of the provisions of the plaintiff's charter and of the trusts thereby created; and that this court is without authority to divert the said estate to the erection of the buildings referred to in the bill, or to modify a trust established by legislative enactment, by limiting the application of any surplus remaining after paying for such building to parochial and charitable purposes within the city of Boston.

The answer further alleged that no vote has been passed by said corporation authorizing an application to this court for the right to sell its meeting-house and land, or for instructions relating to its trusts; and that the filing of said bill and the affixing the name of said corporation thereto was unauthorized, and that the defendants ought not to be holden to answer to said bill, and that the same should be dismissed.

The answer then admitted the organization of a church by Savage and others, and the conveyances and devise by Mary Norton, but alleged that the land on which the church now stands was conveyed by said Norton to said Savage and others and their associates and successors, to build a church upon for their assembling themselves together publicly to worship God, and for the accommodation of such church, with convenient passages for the people that shall there from time to time assemble, and for the erection and accommodation of a dwelling-house for the pastor or teacher of said church, and for no other intent, use or purpose whatever.

The answer also admitted that said Savage and others occupied said land and became seised thereof upon the conditions, and for the uses, and upon the trusts in said conveyances and devise set forth; that Savage and others built a church on said land, and the removal of the same and the building of the present church on the same site in 1729; and the incorporation of the plaintiff by the St. of 1845, c. 229; but alleged the ignorance of the defendants as to whether the proprietors of pews in said house in 1729 and subsequently were the associates and successors of said Savage and others, and whether the lands in said deeds and will described were vested in them; but averred that the premises conveyed and devised by Mary Norton were held by the successors of said Savage and others only upon the conditions and trusts in said conveyances and devise set forth.

The answer further alleged that the St. of 1845, c. 229, provided that the plaintiff should take and hold in fee simple the land before mentioned for the support of public worship, for parochial and charitable purposes in this Commonwealth, and for paying the debts of said corporation; but that said act prohibited the conveyance or lease of said meeting-house and land under the same.

The answer, after admitting the passage of the St. of 1872, c. 368, and the St. of 1874, c. 270, proceeded as follows:

" And the defendants say that the several alleged votes of the plaintiff subsequent to April, 1869, for the purchase of land and the erection of a chapel and meeting-house and other buildings, and the borrowing of money therefor, and the removal from its place of worship and the sale of its meeting-house, if passed, were in violation of the trusts on which the estate of the corporation is held, and of its charter; and the defendants deny that due notice of the objects of the meetings, at which action was had on said alleged votes, was given in accordance with the by-laws of said corporation; and they deny that said votes were passed by said corporation and after due deliberation, and allege that certain members of said corporation were unlawfully prevented from voting on said measures, and that votes of persons not members of said corporation were received and counted in favor of the several measures above named.

" And they admit that large debts have been incurred in the name of said society, and that the amount of said debts and liabilities incurred in the purchase of the land and the erection of the buildings mentioned in the plaintiff's bill is not far from $450,000; and they further say that the expenditures made and liabilities incurred as aforesaid have been unreasonable and extravagant, and have been made and incurred in violation of the plaintiff's trust and of its charter, and have tended to the waste and destruction of said trust estate.

" And the defendants deny that the interests of said society have required or now require a removal from said meeting-house erected on the estate given therefor by said Norton, and allege that said meeting-house is situated in a central portion of the city and in the midst of a large population, and is well situated for the maintaining of public worship and carrying on the work of the church and society, and for fulfilling the trusts created by the donor and by the charter of the plaintiff and the several acts in amendment thereof.

" And the defendants say that all rights of pews in said Old South Meeting-house, and of membership in said corporation, have been acquired subject to the by-laws contained in the exhibits annexed to said bill and under the form of deed therein contained ; and the defendants say that by reason of the several votes and acts set forth in the plaintiff's bill, and by the abandonment of said house as a place of public worship without complying with the conditions of said deeds, all rights to pews in said house, and to membership in said corporation of others than these defendants and certain other pewholders opposed to the sale of said house, who have not been made defendants to this bill, have been forfeited to said corporation.

" And these defendants say that they and the pewholders last above mentioned are the only members of said corporation, and are entitled to the sole control of its estate, subject to the conditions and trusts upon which the same is held.

" And the defendants deny that they have been guilty of any laches or acquiescence in any of the acts and votes of the plaintiff corporation as in said bill alleged, without this, that any other matter in said bill contained, material or necessary for these defendants to make answer unto, and not herein and hereby

well and sufficiently answered, confessed and avoided, traversed or denied, is true to the knowledge or belief of these defendants."

The case was reserved by *Endicott*, J., for the consideration of the full court upon the pleadings, the deeds and will of Mary Norton, the several acts of the Legislature relating to the Old South Church and the Old South Society, the by-laws of the corporation, and the form of deed of pews under which all pews and rights of membership in the corporation have been held, and a report in substance as follows :

It appeared at the hearing that the authority for bringing the suit, if any, was the votes set forth in the exhibits, especially the vote of June 12, 1874, and passed by a vote of twenty-seven to thirteen, and the sanction of the standing committee of the society. It was contended by the defendants that on the above facts the bill should be dismissed for want of authority to file the same.

In January, 1873, the majority, against the protest of the defendants, leased the property to the United States Government, under authority of an act of the Legislature, and in April, at the annual meeting of the society, the new chapel on Boylston Street was declared the meeting-house, according to the vote set forth in the exhibit, against the protest of the defendants.

It further appeared that many persons voting with the majority have, under the above arrangement, attended regularly at the new place of worship at the chapel on Boylston Street, and have not offered their pews to the treasurer as provided in their deeds, which said deeds were in the form above referred to, and the defendants contended that they were thereby disqualified from voting after the annual meeting in 1873 ; and it appeared that if their votes had not been counted, a majority would have been opposed to the sale and to the several alleged votes subsequent to said annual meeting. It appeared that, except as above stated, the several votes set forth in the exhibits to the plaintiff's bill were passed by a majority of the persons present and voting at meetings of the corporation. There was no evidence, unless such alleged several votes of the society and the sanction of the standing committee to the bringing of this bill be so considered, that the sale of the meeting-house and the land thereunder was necessary or expedient, nor was there any other evidence offered that

the society or the public would in any way be the gainer by the removal.

The defendants offered testimony to show that the old meeting-house is conveniently situated for public worship, and there is a large population in its immediate vicinity, and that it is easily accessible to a large number of persons beyond its vicinity ; that the new meeting-house in process of erection is in a portion of the city where there are many other churches, and that the welfare of the society and the purposes of the trust require that the meeting-house should not be sold or removed.    The question whether this evidence was admissible is reserved.

It also appeared that without the sale of the Old South Meeting-house the society would have money enough to pay five hundred thousand dollars, the full cost of the new meeting-house, chapel and parsonage, and have in addition an income of from ten to thirteen thousand dollars, which is as much as is usually appropriated for the support of public worship in similar churches in the city of Boston.    The defendants offered evidence to show that the society had a sufficient fund to maintain public worship in the new meeting-house, without the sale of the old meeting-house, and that it is proper and expedient that the old meeting-house should be retained, in order that public worship may be maintained therein by the said society or the defendants and their associates ; and the defendants offered evidence that they were ready, willing and able to maintain worship in said house, and desire so to do.    The question whether this evidence was admissible is reserved.

The question whether the attorney general should have been made a party is also reserved, and all other questions of law raised by the answer, or upon the face of the plaintiff's bill, or upon this report.

If under the several deeds and acts of the Legislature the society should be authorized to make said sale under and in pursuance of said votes, without any other evidence of its necessity or expediency, or otherwise, and if none of the evidence offered by the defendants was admissible, and if this bill was properly brought and can be properly maintained without the attorney general, then a decree is to be entered accordingly.    If on the other hand the court are of opinion that the suit cannot be main-

tained without making the attorney general a party, the bill is
to be dismissed, unless an amendment should be allowed by the
court.

If the court are of opinion that any of the evidence offered by
the defendants is competent, then the case is to be sent to a mas-
ter. If, upon the case stated in the bill and exhibits and report,
no sale can be legally made, the bill is to be dismissed.

THE SECOND CASE was an information filed by the attorney
general on December 4, 1874, at the relation of the parties de-
fendant in the first case, alleging that the Old South Society
held the land conveyed and devised to it by Mary Norton as
trustee of a public charity; that by the acts done by the de-
fendant, all of which were set forth at length and were the same
appearing in the first case, the defendant had violated its trust,
and praying that it be restrained from selling its land, that it
should be removed from its said trust and that other trustees be
appointed in its stead.

An answer was filed, and the case was reserved by *Endicott*, J.,
for the consideration of the full court on the pleadings and a re-
port similar to that in the first case.

*B. F. Thomas & L. M. Child*, for the Old South Society.

*E. R. Hoar & G. O. Shattuck (R. Gray* with them), for the
defendants in the first case, and the attorney general in the sec-
ond case. 1. The property sought to be sold is held to charitable
uses. The object is charitable. Trusts for the support of public
worship and religious instruction, either under a liberal construc-
tion of the words " repair of churches " in the St. 43 Eliz. *c.* 4, or
by virtue of original equity jurisdiction, have always been held
to be charities. *Earle* v. *Wood*, 8 Cush. 430. *Jackson* v. *Phil-
lips*, 14 Allen, 539, 552. *Attorney General* v. *Pearson*, 3 Mer.
353. The object of the three gifts of Mary Norton, all of which
were gratuitous, was the advancement of religion through the
erection of a meeting-house for the public worship of God and
supplying a dwelling-place for the minister thereof. Gifts to
build a church are held charitable. *Dutch Church* v. *Mott*, 7
Paige, 77. *Beaver* v. *Filson*, 8 Barr, 327. *Schnorr's Appeal*,
67 Penn. St. 138. *Potter* v. *Thornton*, 7 R. I. 252. *Meeting
St. Baptist Society* v. *Hail*, 8 R. I. 234. *Goode* v. *McPherson*,

51 Misso. 126. *Johnson* v. *Mayne,* 4 Iowa, 180. *Scott* v. *Stipe,* 12 Ind. 74. *Hopkins* v. *Upshur,* 20 Tex. 89. *Davis* v. *Jenkins,* 3 Ves. & B. 151. So also are gifts to build a parsonage. *Sewell* v. *Crewe-Read,* L. R. 3 Eq. 60. *Cresswell* v. *Cresswell,* L. R. 6 Eq. 69. The gifts are to Thomas Savage and others "and to such as they shall associate to themselves, their heirs and successors forever." Any persons of the same religious views might become members of the society by buying pews in the church. The society could be no source of pecuniary profit to its members ; and the fact that the members paid for their pews can be no objection to its being a charity. *Gooch* v. *Association for Aged Females,* 109 Mass. 558. *Gass* v. *Wilhite,* 2 Dana, 170.

The beneficiaries are sufficiently indefinite. It is only necessary that they should take by virtue of their position and not as individuals. A gift otherwise a charity will be none the less so because its benefits are confined to a class of persons who are represented at the time of the gift by certain definite individuals. Thus the following gifts are held to be charities, though there is no uncertainty as to the persons to be immediately benefited : A gift to a priest or minister, by virtue of his office. *Attorney General* v. *Cock,* 2 Ves. Sen. 273. *Thornber* v. *Wilson,* 3 Drew. 245 ; 4 Drew. 350. *Attorney General* v. *Dublin,* 38 N. H. 459. A gift to a lodge of Freemasons. *King* v. *Parker,* 9 Cush. 71. *Vander Volgen* v. *Yates,* 3 Barb. Ch. 242. *Duke* v. *Fuller,* 9 N. H. 536. *Indianapolis* v. *Grand Master,* 25 Ind. 518. A gift to a particular religious society. *Earle* v. *Wood,* 8 Cush. 430. *Dexter* v. *Gardner,* 7 Allen, 243. *Beatty* v. *Kurtz,* 2 Pet. 566. *Magill* v. *Brown,* Brightly, 346, note. *Williams* v. *Williams,* 4 Seld. 525. *Cammeyer* v. *United German Lutheran Churches,* 2 Sandf. Ch. 186, 237. *Banks* v. *Phelan,* 4 Barb. 80. *Wright* v. *Methodist Church,* Hoffm. Ch. 202. *Price* v. *Maxwell,* 28 Penn. St. 23. *Attorney General* v. *Dublin,* 38 N. H. 459. *Gass* v. *Wilhite,* 2 Dana, 170. *Curd* v. *Wallace,* 7 Dana, 190, 192. *Attorney General* v. *Jolly,* 2 Strob. Eq. 379. *White* v. *University,* 4 Ired. Eq. 19, 20. *Bridges* v. *Pleasants,* 4 Ired. Eq. 26, 31. *Johnson* v. *Mayne,* 4 Iowa, 180. *Ward* v. *Hipwell,* 3 Giff. 547. *Attorney General* v. *Gould,* 28 Beav. 485. A gift of land for the purpose, as in this case, of building a particular church. *Dutch Church* v. *Mott,* 7 Paige, 77, and other cases before cited. In

the following recent English cases, legacies for the purpose of building a chapel or parsonage were assumed to be charitable, the only question being whether they came within the Mortmain Act, 9 Geo. II. *c.* 36. *Sewell* v. *Crewe-Read*, L. R. 3 Eq. 60. *Booth* v. *Carter*, L. R. 3 Eq. 757. *Cresswell* v. *Cresswell*, L. R. 6 Eq. 69. *In re Watmough*, L. R. 8 Eq. 272. *Sinnett* v. *Herbert*, L. R. 12 Eq. 201; *S. C.* L. R. 7 Ch. 232. *Pratt* v. *Harvey*, L. R. 12 Eq. 544. *In re Lee*, 21 W. R. 168; 27 L. T. (N. S.) 808.

*Anonymous*, 3 Atk. 277, and *Swift* v. *Easton Beneficial Society*, 73 Penn. St. 362, are sometimes cited as holding certain trusts not to be charities for want of indefiniteness, but they proceeded on other grounds. They are cases of societies in the nature of mutual insurance companies, where each member pays a regular assessment in consideration of relief in case of necessity or illness. They are no more charities than annuity offices or accident insurance companies. They are pecuniary enterprises, and the members make a pecuniary investment expecting to get their money's worth. Such societies may be and often are run at a profit and declare dividends. The legal objection is that their objects are not charitable within the St. 43 Eliz. *c.* 4. The same objection applies to a gift to a private school, (*i. e.*, not free,) as such schools are pecuniary enterprises, and intended to be run at a profit. *Attorney General* v. *Hewer*, 2 Vern. 387. *Attorney General* v. *Newcombe*, 14 Ves. 1. But it is no objection that a school exists for the benefit of a restricted class of persons. *Meeting St. Baptist Society* v. *Hail*, 8 R. I. 234. In *Carne* v. *Long*, 2 De G., F. & J. 75, the gift was to a body substantially a private library association, and hence not a charity. In *Thomson* v. *Shakespear*, 1 De G., F. & J. 399, the court declared that a museum to be established at Shakespeare's house in Stratford could not be brought under any of the classes of charities enumerated in the 43 Eliz. *c.* 4. In *Attorney General* v. *Haberdashers' Co.* 1 Myl. & K. 420, the Haberdashers' Company was held to be a trading company and not a charity. In all the foregoing cases the objection was that the object was not charitable, and not any lack of indefiniteness in the beneficiaries. *Thomas* v. *Howell*, L. R. 18 Eq. 198, is an example of a gift which fails as a charity for want of indefiniteness. The gift was to ten poor clergymen of the Church of England, to be selected by A. B.

and was held not a charity, because it was a gift to individuals, and not a perpetuity. The ten clergymen, once selected, would take as individuals, and not by virtue of their office or position.

Every trust is either a charity or else a private trust, which must be limited within a life or lives in being and twenty-one years. So that gifts for the founding and support of Congregational churches in this Commonwealth, if not charities, would be void as perpetuities. *Jackson* v. *Phillips*, 14 Allen, 539, 550. *Odell* v. *Odell*, 10 Allen, 1, 6. *Dexter* v. *Gardner*, 7 Allen, 243. *Carne* v. *Long*, 2 De G., F. & J. 75. *Thomson* v. *Shakespear*, 1 De G., F. & J. 399. It seems that such gifts are perpetual trusts of some sort. *In re New South Meeting-house*, 13 Allen, 497. *Second Congregational Society* v. *Waring*, 24 Pick. 304. *Wheaton* v. *Gates*, 18 N. Y. 395. There appears to be no reason why a Congregational religious society should not be " technically charitable," that does not apply equally well to a lodge of Freemasons or a society of Friends. *King* v. *Parker*, 9 Cush. 71. *Earle* v. *Wood*, 8 Cush. 430. *Dexter* v. *Gardner*, 7 Allen, 243.

When the other requisites of a charity exist, the test is not in the definiteness or indefiniteness of the persons actually receiving a benefit at any one time, but in the intent of the gift. If the intent is to confer a benefit upon the public, or upon a large and indefinite portion of the public, such as a certain denomination of Christians, the fact that the fund is not large enough to benefit all at any one time will not prevent the gift being charitable.

The decision *In re New South Meeting-house*, 13 Allen, 497, is made clearer by calling the corporation a charity. The suggestion of Bigelow, C. J., in that case, that religious corporations form a third class of trusts which are neither private trusts nor public charities, but *quasi* public, has no foundation in authority. There is no case in this Commonwealth which decides that a gift to a Congregational church is not a charity. In *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1, the decision is put distinctly on the ground that there was no gift, the grantor selling his land and receiving a pecuniary consideration from the society. *Attorney General* v. *Heelis*, 2 Sim. & Stu. 67, 77. The intimation that the beneficiaries of the trust were not sufficiently indefinite for a charity, is wholly immaterial to the decision.

Religious corporations have been recognized as charities by the Legislature of this Commonwealth. Sts. 1809, c. 91, § 4; 1815, c. 12.

The Old South Society, so far as the deed is concerned, must stand upon the same ground as other religious societies in this Commonwealth which were founded by gift. And if it is for the public good that the worship of God should be maintained, public policy requires that such bodies should be charities. For, if not charities, there is nothing to prevent them from changing themselves by a unanimous vote into trading corporations, from declaring dividends or dividing up their entire property among their members. If any of these things were done, supposing churches not to be charities, the Commonwealth could not interfere through the attorney general, nor could any private person call them to account, as all interested, both trustees and *cestuis que trust*, would have consented to the act. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1, 60, 61. *Wheaton* v. *Gates*, 18 N. Y. 395, 403. Such an absolute power over the church property by the members of a religious society would be greatly to be deplored. For if it was once understood that churches were irresponsible bodies, a congregation whose property was large and whose enthusiasm had declined from the loss of a favorite pastor or some other cause, might find it expedient to divide up its property and for the members to join other congregations. Or, being unrestricted in the use of its funds, a congregation might choose to declare a dividend from its surplus income, so that pews would become a profitable investment and the society be reduced to the level of a trading corporation. In this way there would be danger that the number of churches would be diminished, and that many of those that remained might lose their distinctive character. The only safeguard would be the good faith of the congregations, when tempted by a pecuniary gain to which they would have a legal right.

2. Assuming that the deeds and will of Mary Norton created a charity, the act of incorporation, St. 1845, c. 229, continued the original trust. *French* v. *Old South Society*, 106 Mass. 479, 487. In general, when a charter is granted to a charity already created by private gift, it is presumed that the charter is granted with the intent of carrying out the original trust. *Attorney Gen-*

*eral* v. *Dedham School*, 23 Beav. 350. *Miller* v. *English.* 1 Zab. 317.

The charter of the Old South Society expressly declares that " said corporation shall be deemed and taken to be the successors of said proprietors." The provision that the corporate funds shall be held " for parochial and charitable purposes " shows that the Legislature intended to incorporate a charity. The effect of the charter is, then, to incorporate the proprietors of pews, and one becoming a pewholder under the by-laws of the society thereby becomes a member of the corporation, which holds the legal estate as trustee. The pewholders are also beneficiaries of the charity for the time being. *Second Congregational Society in North Bridgewater* v. *Waring*, 24 Pick. 304. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1, 60, 61. The same persons are therefore at the same time trustees and *cestuis que trust.* But this does not prevent the corporation from being a charity. The same was true in *Thornber* v. *Wilson*, 3 Drew. 245 ; *S. C.* 4 Drew. 350.

The present pewholders are only a part of the beneficiaries. For the trust is a perpetuity and their successors have an interest in it ; and each pew is occupied by many persons besides the owner, his family, friends, lessees or the public, who use it by his license. It is matter of common knowledge that there is rarely more than one owner to each pew, which is nevertheless made to hold five or six persons. So that the original foundation of a church contemplates that the benefits of it shall be enjoyed by a large number of indefinite persons, other than those who have specific legal rights in the property. These two classes of persons have no present representative of their interests, and it is for this reason that the attorney general must be made a party, as in all suits concerning the revenues of charities. The injustice of allow-ing a few proprietors to settle this question for all the present worshippers and for all future generations is clear. It is the common case of a *cestui que trust* being trustee for himself and others, as in *Belknap* v. *Belknap*, 5 Allen, 468.

But, whatever may be the general principle as to a gift of land to a religious society, it is clear, that under this charter the prop-erty, or the excess after paying the expenses of the society, is held for a public charity. If, by the terms of the gift of Mary

Norton, it was made a public charity, there is nothing in the charter changing that trust. If, on the other hand, the society existing prior to the acceptance of the charter, did not hold the property in trust for a public charity, and could by unanimous consent have disposed of it as they pleased, the transfer of it by unanimous consent to the new corporation, to be used in accordance with the charter for charitable purposes in this Commonwealth, created a public charity. If the surplus above what is necessary for the purposes of the society is held for charitable uses, then the public must be represented in any dealing with the property, otherwise the society could decide how much should be devoted to charitable uses, and the public would have no control.

The expression " and for paying the debts of said corporation " applies only to such debts as are not *ultra vires*, and may lawfully be contracted by the corporation. This does not affect the question of what the nature of the corporation is.

WELLS, J. We find no public charity created by either of the three instruments under which title to the premises in question was derived from Mary Norton.

By her deed of April 1, 1669, the legal estate in the land therein described passed to and became vested in the ten persons named as grantees. A trust was declared, however, the beneficiaries of which were the grantees themselves with " such as they should associate to themselves." The further limitation to " their heirs and successors " indicates that the grantor contemplated a permanence of association of the *cestuis que trust*, and intended to convey the fee in the land.

The purposes of the trust, as set forth in the deed, were, 1st, " for the erecting of a house for their assembling themselves together publiquely to worship God ; " 2d, " the erecting of a dwelling-house for such Minister or Ministers as shall be by them and their successors from time to time orderly and regularly admitted for the Pastor or Teacher to the said Church or Assembly ; " and they are further guarded by the restriction " and for noe other intent, use or purpose whatsoever."

Gifts for the erection of a house for public worship, or for the use of the ministry, may constitute a public charity, if there is no definite body, for whose use the gift was intended, capable of receiving, holding and using it in the manner intended. To give

it the character of a public charity there must appear to be some benefit to be conferred upon, or duty to be performed towards, either the public at large or some part thereof, or an indefinite class of persons. *Going* v. *Emery*, 16 Pick. 107, 119. Perry on Trusts, § 710. *Saltonstall* v. *Sanders*, 11 Allen, 446. But when there is a body, or a definite number of persons, ascertained or ascertainable, clearly pointed out by the terms of the gift to receive, control and enjoy its benefits, it is not a public charity, however carefully and exclusively the trust may be restricted to religious uses alone. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1, 49. *Parker* v. *May*, 5 Cush. 336.

The deed of Mary Norton clearly contemplated that the grantees and their associates then formed, or were about to form, a voluntary religious society; and it was for the use and benefit of such society, in the promotion and convenience of the religious exercises and public worship to be maintained and conducted by and for themselves, that her gift was made to aid in providing a house for those religious exercises, and also a house for the residence of such person as should at any time serve them as their minister. *Attorney General* v. *Merrimack Manuf. Co.* 14 Gray, 586, 602.

The *cestuis que trust* were indeed an indefinite number of persons, in the sense that there was no fixed number to whom the designation of "associates" would apply; and they were doubtless intended to include all who should, in accordance with what might be adopted as the rules of association or organization, at any future time become members of the society; and thus the enjoyment would be continued perpetually. A trust so constituted is capable of serving these shifting interests in the beneficiaries; *Second Congregational Society in North Bridgewater* v. *Waring*, 24 Pick. 304; *King* v. *Parker*, 9 Cush. 71, 82; and is not obnoxious to the rule of law against perpetuities which prevent alienation; because the entire interest at any time is represented by known persons living; to wit, the legal estate by the trustees, there being always power in the court, in case of necessity, to supply trustees in whom the estate will vest; the equitable interest by those persons who then constitute the body of the associates or the society, who may be ascertained according to its rules governing membership.

· The character and purposes of the association named as *cestui que trust*, and the designation of the religious uses for which the property was given, do not necessarily indicate an intent to create a public charity. Such an implication sometimes arises from the character of the body to which the gift is made, or from the publicly avowed purposes of its organization and action; as in the case of *Tucker* v. *Seaman's Aid Society*, 7 Met. 188 ; Concord Female Charitable Society in New Hampshire, *Washburn* v. *Sewall*, 9 Met. 280 ; American Board of Commissioners for Foreign Missions, *Bartlet* v. *King*, 12 Mass. 536 ; American Education Society and American Bible Society, *Burbank* v. *Whitney*, 24 Pick. 146 ; *Bliss* v. *American Bible Society*, 2 Allen, 334.

Property held in trust for a Monthly Meeting of Friends seems to have been regarded as a public charity in *Earle* v. *Wood*, 8 Cush. 430, and in *Dexter* v. *Gardner*, 7 Allen, 243 ; and for a lodge of Freemasons, in *King* v. *Parker*, 9 Cush. 71. But neither of those cases was a proceeding which concerned the administration of a charity, as such. They were suits in equity relating to trusts, in which the rights of private parties alone were represented. There was no public charity declared in either case, and no adjudication which necessarily involved or was based upon the existence of a charitable trust.

A fund, to be dispensed exclusively by way of mutual benefit or aid among the members of an association, is a private and not a public charity. 3 Gray, 50. 11 Allen, 464. It may well be questioned, therefore, whether all the conditions requisite for a technical public charity were present in the case of *King* v. *Parker*, cited above.

Conceding that " monthly meetings," embracing as they do the entire community of people called " Friends," are so indefinite and general, and the purposes of their organization such that gifts in trust for their use will constitute strictly a public charity, still there is a marked distinction between such bodies and a congregational poll parish or society of defined, regulated, and, therefore, limited membership.

Property devoted to the support and maintenance of public worship, which is public only in the sense that it is open to the public by courtesy, in accordance with the usual practice of all churches in this Commonwealth, does not thereby become a

public charity. 3 Gray, 50. 14 Gray, 602. *Attorney General* v. *Trinity Church*, 9.Allen, 422. Perry on Trusts, § 732. The deed of Mrs. Norton undoubtedly contemplated public worship of that character, but she entrusted its administration and limited the legal right of enjoyment to those who should become associated with her grantees, and their successors, and thus constitute a poll parish or religious society.

The fact that it is carefully restricted to religious uses, as already suggested, does not alone give it the character of a public charity. *Wells* v. *Heath*, 10 Gray, 17. As a trust, the whole estate passed from the grantor. There is reserved no right of defeasance and reverter or limitation over in case of a disregard of the restriction ; and if there were, it would not avail to transfer the use or to convert it from a private to a public charity. *Brattle Square Church* v. *Grant*, 3 Gray, 142. *Wells* v. *Heath*, 10 Gray, 17. *Drury* v. *Natick*, 10 Allen, 169, 183.

The deed of June 30, 1677, does not give rise to any materially different question. It conveys an adjoining estate to the six survivors of the trustees named in the previous deed, and to such as have been " or shall be associated, to them and to their heirs and successors forever, for the ends and purposes in the first above mentioned deed of April the first, 1669, is fully and amply declared," with the house already erected thereon, " for the use of their ministers or ministry orderly chosen by the said society, being the Third Church of Christ in Boston, from time to time and at all times forever." This is not a provision for a ministry at large, or a ministry independent of the society ; but is for the benefit of the society by enabling them to provide for the support and convenient residence of such persons as they might employ to serve them as their minister. *Wells* v. *Heath*, 10 Gray, 17, 23.

The will devises her own house to the " Third Church of Christ in Boston," naming, as trustees, two only of the persons who were trustees under her previous deeds. The devise is manifestly intended to be in furtherance of the same objects as the conveyances by deed, and for the use of the same beneficiaries, although differently designated. It is declared to be " for the use of the ministry in the said church successively forever." The reasons for making the gift, assigned by her, especially in connection with the previous deeds, show that it was intended, like the convey-

ances, for the benefit of the religious society formed by her trustees, their associates and successors, and exclude the idea of a more general public charity.

By the St. of 1845, *c.* 229, the proprietors of pews in the " Old South Meeting-house " and their successors were made a corporation, and authorized to take and hold, to the use of said corporation, in fee simple, the property then "known as the estate belonging to the Old South Church and Society." It is not disputed that these corporators were the proper successors of Mary Norton's grantees and devisees and their associates who constituted the " Church or Assembly " designated by her as the " Third Church of Christ in Boston." They therefore represented the *cestuis que trust,* and were entitled to the beneficial interest in the estate. Precaution not having been taken to preserve a succession in the trustees for the transmission of the legal title, that remained nominally in the heirs of the survivor of the original trustees named by Mary Norton. By the act of incorporation, that title also was made to vest in the corporate body. It was manifestly not the intention of the Legislature that an absolute merger of the two interests should result so as to discharge the estate from the trusts with which it had been impressed. It was accordingly declared that it should continue to be held " for the support of public worship, for parochial and charitable purposes in this Commonwealth, and for paying the debts of said corporation." But this declaration of uses does not define a public charity, even if it were competent for the Legislature to constitute or declare one out of a trust where it did not exist before. Perry on Trusts, § 711.

We cannot doubt that lands so held may be sold by authority of the Legislature; *Stanley* v. *Colt,* 5 Wallace, 119, 169 ; or of this court as a court of equity, charged with the supervision and enforcement of trusts, under the Gen. Sts. *c.* 100, § 16. We do not find, in the special circumstances and character of the authority conferred by the charter to hold this particular real estate, any inhibition of the usual power of sale by leave of the court, which attaches to trust estates generally. And the special authority to apply to this court, contained in the St. of 1874, *c.* 270, would seem to remove any inhibition which might otherwise be implied from the character of the original act or charter. But

we think it is equally clear that the vote of a majority of the pewholders or members of the society is not of itself a sufficient authority to enable the corporation to make the sale, nor a sufficient reason to justify this court in authorizing it to be made. The trust is one in which each individual member of the society has an interest as an intended beneficiary, and a right to be heard upon the question of the proper administration of the trust in reference to its original character and purpose, and the effect of the proposed change upon all the members, the minority as well as the majority. It is incumbent upon those who seek to make the change to satisfy the court that it is reasonably required for the accommodation of the society as a whole, and that the proposed change will not subject the minority to an unreasonable sacrifice of interest or convenience, or in any way work injustice to them. The respective rights of the corporation and of its individual members in respect of such property are so fully set forth in the case *In re New South Meeting-house in Boston*, 13 Allen, 497, as to require no further discussion here, in advance of the hearing which must be had to devolop the grounds that may exist for or against the proposed sale.

Upon that hearing, the alleged abuse by the corporation, or by the majority, in using the trust funds to build a meeting-house elsewhere, and in resorting to that house for the meetings of the society for public religious worship, will have such weight as it is entitled to have. If, as the minority contend, it deprived the majority of all standing as members of the society and beneficiaries of the trust, so that those who desire to remain and continue the maintenance of public worship in the house upon the original site may be regarded as constituting the body of the society, entitled both to the corporate franchise and the beneficial enjoyment of the trust estate; or if it warrants and requires that the court should remove the trustee and place the estate in the charge of new trustees, to secure the accomplishment of the original purpose of the donor, neither of these results can be reached by either of the present suits : not by the information by the attorney general, because that is based exclusively upon the supposed character of the trust as a public charity, which is not sustained; not by the bill in equity, because no decree in favor of the minority can be made in that, except to refuse to authorize the sale or declare a rignt to sell.

The objection that no right was shown to institute the bill in equity in the name and behalf of the corporation was not urged at the argument, and we regard it as waived. That to the non-joinder of the attorney general fails, of course, with the information itself.

The result is that the information by the attorney general must be dismissed, and the bill in equity must stand for hearing before a single justice.            *Ordered accordingly.*